IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| BOARD OF TRUSTEES OF THE PAMCAH-UA LOCAL 675 PENSION FUND,<br><br>Plaintiff,<br><br>vs.<br><br>SMAC HAWAII, INC., *et al.*,<br><br>Defendants. | Civil No. 23-00076 MWJS-KJM<br><br>ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT |

## INTRODUCTION

SMAC Hawaii, Inc. was a union shop air conditioning and sheet metal company that, for three decades, made annual payments to the PAMCAH-UA Local 675 pension fund. That fund provides pension benefits to union employees at small businesses in the area. In 2012, an employee at SMAC embezzled a significant amount of money. SMAC suffered severe financial hardship, lost its contractor's license, and closed at the end of 2018. As SMAC was winding down, R&M Air Conditioning, LLC—a purportedly separate entity, but one with striking similarities to SMAC—opened for business. R&M is a non-union employer and does not contribute to any union pension fund.

In September 2020, SMAC informed the Board of Trustees of the PAMCAH-UA Local 675 pension fund (the "Board") that it had ceased operations and was terminating

its status as a signatory contractor to the Union—meaning that it would no longer contribute to the pension fund.  The Board then notified SMAC that because the pension fund was underfunded, SMAC owed withdrawal liability of $610,255 to cover its share of the fund's vested benefits.  And while employers in the building and construction industry are generally excepted from withdrawal liability if they cease operations in the relevant area, the Board took the position that SMAC was ineligible for this exception because it had effectively continued operations as a non-union entity through R&M.

In this suit, the Board seeks to collect the withdrawal liability from SMAC, R&M, the individual owners of these entities, and a sole proprietorship owned by two of the individual defendants.  And the Board has now moved for summary judgment, arguing that it is entitled to judgment as a matter of law.  Defendants filed a cross-motion for summary judgment.  For reasons explained below, the court GRANTS the Board's motion for summary judgment in part, DENIES the Board's motion in part, and DENIES Defendants' motion for summary judgment in its entirety.

## BACKGROUND

### A.    ERISA Legal Framework

Congress enacted the Employee Retirement Income Security Act of 1974 (ERISA) to regulate pension plans and "assure private-sector workers that they would receive the pensions that their employers had promised them."  *Milwaukee Brewery Workers'*

*Pension Plan v. Joseph Schlitz Brewing Co.*, 513 U.S. 414, 416 (1995). Together with other

regulations, ERISA sets minimum funding standards to ensure that private employers

will be able to pay pensioners in the future. *See* 26 U.S.C. § 412.

But private employers sometimes pool their employees into multiemployer

pension plans, and ERISA proved inadequate to ensure the solvency of these types of

plans. That was because ERISA, as originally enacted, allowed "employers

participating in a multiemployer plan [to] withdraw" from an underfunded plan

without paying a withdrawal fee. *GCIU-Emp. Ret. Fund v. MNG Enters., Inc.*, 51 F.4th

1092, 1095 (9th Cir. 2022). And as "employers withdrew, the fund's assets shrank; in

turn, the remaining employers had to contribute more to meet the minimum funding

standards," thereby "creat[ing] a vicious cycle" of underfunding. *Id.*

Congress enacted the Multiemployer Pension Plan Amendments Act of 1980

(MPPAA) to address this problem. *See* 29 U.S.C. §§ 1381-1461. Under § 1381(a) of the

MPPAA, "most employers who withdraw from underfunded multiemployer pension

plans [must] pay 'withdrawal liability.'" *Bay Area Laundry & Dry Cleaning Pension Tr.

Fund v. Ferbar Corp. of Cal.*, 522 U.S. 192, 196 (1997) (quoting 29 U.S.C. § 1381(a)). This

withdrawal liability is meant to "compensate[] the plan for the shrinkage in the

contribution base and the shifting to the plan of the remaining burden of funding that

occurs when the employer withdraws." *Brentwood Fin. Corp. v. W. Conf. of Teamsters

Pension Tr. Fund*, 902 F.2d 1456, 1458 (9th Cir. 1990).

3

An employer "incurs withdrawal liability when it effects a 'complete withdrawal' from the plan," *Bay Area Laundry*, 522 U.S. at 196, that is, when the employer "permanently ceases to have an obligation to contribute under the plan" or "permanently ceases all covered operations under the plan," 29 U.S.C. § 1383(a).  When a complete withdrawal occurs, a fund's trustees are charged with calculating the employer's withdrawal liability, providing a notice of the amount due "[a]s soon as practicable" after the employer's withdrawal, and setting a payment schedule.  29 U.S.C. § 1399(b)(1); *see Bay Area Laundry*, 522 U.S. at 192.  Upon receiving the withdrawal liability notice, an employer may either accept the liability or request that the trustees review it.  *See* 29 U.S.C. §§ 1399(b)(2), 1401(a)(1).

If the trustees stand by the liability, and the employer continues to dispute its withdrawal liability, the MPPAA provides that any remaining dispute regarding withdrawal liability "shall be resolved through arbitration."  29 U.S.C. § 1401(a)(1).  A failure to initiate arbitration waives any objection to the assessed withdrawal liability. *See Teamsters Pension Tr. Fund-Bd. of Trustees of W. Conf. v. Allyn Transp. Co.*, 832 F.2d 502, 505-06 (9th Cir. 1987).  And if no party initiates arbitration, the withdrawal liability payment "shall be due and owing on the schedule set forth by the plan sponsor."  29 U.S.C. § 1401(b)(1).  Even if the employer "challenges the trustees' withdrawal liability determination, however, it still must pay according to the trustees' schedule in the interim under the statute's pay now, dispute later collection procedure."  *Bay Area*

*Laundry*, 522 U.S. at 197 (cleaned up).  If the employer fails to pay according to that schedule, the trustees may either accelerate the amount due or sue to collect it.  *See id.*; 29 U.S.C. §§ 1399, 1451(a)(1).

Three other features of the MPPAA are relevant to this case.  First, the MPPAA adopts a broad definition of "employer," which includes "not only the entity making contributions to the pension plan, but also 'trades or businesses (whether or not incorporated)' that are under 'common control' with the contributing entity." *Carpenters Pension Tr. Fund for N. Cal. v. Lindquist*, No. 10-3386, 2011 WL 2884850, at *3 (N.D. Cal. July 19, 2011), *aff'd*, 491 F. App'x 830 (9th Cir. 2012) (quoting 29 U.S.C. § 1301(b)(1)).  Any such trades or businesses under common control will be "considered a single employer under ERISA and are jointly and severally liable for each other's withdrawal liability."  *Id.*

Second, the MPPAA does not limit withdrawal liability solely to the "employer," but rather allows it to be imposed on a successor entity, too, so long as that successor has notice of the withdrawal liability.  *See Resilient Floor Covering Pension Tr. Fund Bd. of Trs. v. Michael's Floor Covering, Inc.*, 801 F.3d 1079, 1084 (9th Cir. 2015).  Successor liability is an important feature of the MPPAA because "absent the imposition of successor liability, present and future employer participants in the union pension plan will bear the burden of the predecessor's failure to pay its share, which will threaten the health of the plan while the successor reaps a windfall."  *Id.* at 1093 (cleaned up).

Third, although the MPPAA requires most employers and successor entities to pay withdrawal liability after a complete withdrawal from an underfunded pension fund, the statute provides an exception for employers in the building and construction industry. *See* 29 U.S.C. § 1383(b). This exception—known as the "construction industry exception"—provides that "employers in that industry who entirely cease operations are not subject to the withdrawal liability that § 1381 would otherwise impose, unless they resume construction work within five years without also renewing their obligation to contribute to the plan." *Michael's Floor Covering*, 801 F.3d at 1089. But the exception is "narrow." *Id.* at 1094. It is founded on the logic that, "in the construction industry, the funding base of the plan is the construction projects in the area where the plan is administered." *Id.* at 1089 (cleaned up). This means that "as long as contributions are made for whatever work is done in the area, there is no threat to the plan's future funding viability; if an individual employer withdraws and goes out of business, other employers who contribute to the pension plan on behalf of their employees will perform that work." *Id.* at 1089-90 (cleaned up).

That logic breaks down, however, when "the employer stays in the industry but goes non-union and ceases making payments to the plan." *Id.* at 1090 (cleaned up). "In that case, employers continue to undertake construction work without contributing to the plan," and so, "assuming a constant number of construction projects in a locale, the number of employee hours for which contributions are made will go down." *Id.* For

that reason, the MPPAA's narrow construction industry exception is unavailable to
"employers who cease making payments to the plan while continuing to do business in
the area." *Id.*

　　With this statutory framework in mind, the court turns to the facts of this case.

### B.　　Factual Background

　　SMAC was incorporated in 1969 by Melvin E. Mung Lim, Sr., and provided sheet
metal and air conditioning services for residential and commercial projects in and
around Kapolei, Oʻahu.  ECF No. 100-10, at PageID.3647; ECF No. 84-1, at PageID.660
(Pl.'s Concise Statement of Facts (CSF) ¶ 10).  In 1985, SMAC entered into an agreement
with the Local 675 of the United Association of Journeymen and Apprentices of the
Plumbing and Pipefitting Industry, AFL-CIO (the Union) to be a union employer and
contribute to the Union's pension fund.  ECF No. 84-1, at PageID.660 (Pl.'s CSF ¶¶ 4-5,
15).  Melvin E. Mung Lim, Jr.[1] began working for SMAC in the 1980s.  *Id.* (¶ 16).  Over
the years, Melvin started to take on greater responsibilities at SMAC, and he eventually
became the sole owner in 2003.  *Id.* (¶¶ 17-18).  In 2010, Glenda Yoza was hired as
SMAC's project manager, and in 2011, Margaret Lim, Melvin's wife, retired from her job
as a bank teller and worked as SMAC's office manager.  *Id.* (¶¶ 28 & 30).

---

[1]　　Because there are several family members with the same last name involved in
the case, the court refers to these individuals by their first names for clarity.  "Melvin"
refers to Melvin E. Mung Lim, Jr.; "Margaret" is his wife, Margaret T. Mung Lim; and
"Meghan" is their daughter, Meghan M. Mung Lim.

In 2012, Melvin discovered that SMAC's bookkeeper had embezzled a significant amount of money from the company. *See* ECF No. 84-5, at PageID.779; ECF No. 100, at PageID.3418 (Defs.' CSF ¶ 19). And in the years to come, SMAC struggled financially. By 2014, SMAC had become delinquent in making contributions to the Union's trust funds, including the pension fund. *See, e.g.*, ECF No. 88-12, at PageID.3017; ECF No. 100-4, at PageID.3561. In 2017, Melvin and Margaret began negotiations to sell their interest in SMAC's shop property. ECF No. 84-1, at PageID.662 (Pl.'s CSF ¶ 75).

R&M is also a company that provides sheet metal and air conditioning services for residential and commercial projects in and around Kapolei, Oʻahu. *Id.* at PageID.661 (¶ 36). It was co-founded in March 2017 by Margaret and Meghan (Margaret and Melvin's daughter). *Id.* at PageID.660 (¶¶ 7-8); ECF No. 85-4, at PageID.1237.[2] At that time, R&M's mailing address was the same as SMAC's shop address. ECF No. 84-1, at PageID.663 (Pl.'s CSF ¶ 91). R&M's full operations started up in 2019, when it received a $40,000 loan from Melvin and began taking on customers. *Id.* at PageID.664 (¶ 105).

Melvin also had a side business called M&M Sheet Metal Company ("M&M"). *Id.* at PageID.660 (¶6). He was the owner of the sole proprietorship, which he used for

---

[2]    Because Defendants do not oppose the Board's Request for Judicial Notice in Support of the Concise Statement of Material Facts Filed Concurrently with Plaintiff's Motion for Summary Judgment, ECF No. 90, and because each of the documents satisfy the requirements of Federal Rule of Evidence 201, the court GRANTS that request. *See Pac. Cheese Co. v. Advanced Coil Tech., LLC*, No. 15-CV-00351, 2015 WL 7568582, at *3 n.3 (D. Nev. Nov. 24, 2015) (taking judicial notice of an "Amendment of Articles of Organization for a Limited Liability Company because it is a public record").

"side projects" that included air conditioning work.  *Id.* at PageID.661 (¶ 32).  M&M

sometimes paid for SMAC's phone bill and other business expenses, and Margaret

signed checks on M&M's behalf.  *Id.* at PageID.660-61 (¶ 31, 33-34).  And Melvin and

Margaret also owned several investment properties while SMAC was in operation.

They owned one property that was leased to SMAC, another that was used for R&M's

mailing address, and a final property that was held as a rental/investment property.  *Id.*

at PageID.661-662, 665 (¶¶ 11, 39, 60, 72, & 123); ECF No. 87-14, at PageID.1715; ECF

No. 87-15, at PageID.1723-33.

As SMAC was winding down and R&M was opening, Margaret negotiated two

air conditioning service agreements with one of SMAC's customers, Jean-Claude Drui—

one for R&M, to provide air conditioning services for Euram, Inc., Drui's business, and

another for SMAC, to provide air conditioning services for Drui's residence.  ECF No.

84-1, at PageID.662 (Pl.'s CSF ¶ 78).  Both contracts were set to start in January 2018.  *Id.*

Then, at the end of 2018, SMAC moved out of its physical shop location.  ECF No. 84-1,

at PageID.662 (Pl.'s CSF ¶ 81).  During the move, some of SMAC's equipment, furniture,

and vehicles were given to R&M free of charge.  *Id.* at PageID.663 (¶ 83); ECF No. 86-9,

at PageID.1406.  And in January 2019, SMAC sent a letter to its customers stating that it

was closing.  *Id.* (¶ 82); ECF No. 86-8, at PageID.1402.

SMAC's last reported union worker hours in July 2018.  ECF No. 84-3, at

PageID.693.  Margaret continued to submit fringe benefit contribution reports that

9

listed zero hours for SMAC's union employees until February 2020.  ECF No. 84-1, at

PageID.664 (Pl.'s CSF ¶ 115).  A few months later, in June 2020, Jenny Lee, the assistant

to the Union's business manager, contacted SMAC to see if it still intended to be a

signatory employer, and Margaret told Lee that SMAC had ceased operations.  *Id.*

(¶ 116); ECF No. 87-10, at PageID.1705.  And in September 2020, Margaret sent a letter

signed by Melvin on SMAC's behalf to the Union requesting termination of its

signatory agreement.  ECF No. 84-1, at PageID.664 (Pl.'s CSF ¶ 117); ECF No. 87-12, at

PageID.1710.  In response, the Board asked Margaret to confirm that SMAC intended to

terminate its agreement before the request was sent to the Board.  ECF No. 84-1, at

PageID.664 (Pl.'s CSF ¶ 118); ECF No. 88-17, PageID.3051.  Margaret was warned that

"[w]hen a signatory company requests termination and continues working as a non-

union" successor entity, the withdrawing union shop is "subject to Pension Withdrawal

Liability fees . . . that can be quite substantial."  ECF No. 84-1, at PageID.664 (Pl.'s CSF

¶ 119); ECF No. 88-17, PageID.3051.  And the Board communicated that it was aware of

R&M's formation, and that SMAC and R&M would be responsible for withdrawal

liability if R&M was performing work that would have previously been covered by the

union's jurisdiction, with nonunion labor.  ECF No. 88-17, PageID.3051.  Margaret

confirmed that SMAC was withdrawing from the fund, but in her email to the Board

she explained that R&M was a separate entity with different owners, and therefore

should not be subject to withdrawal liability.  ECF No. 84-1, at PageID.664 (Pl.'s CSF

¶ 120); ECF No. 88-17, PageID.3050-51.

In February 2021, the Board's counsel sent Margaret a letter requesting

information to determine whether SMAC and R&M would be responsible for

withdrawal liability from the pension fund.  ECF No. 84-1, at PageID.664 (Pl.'s CSF

¶ 121).  In the next few months, Margaret provided some information about SMAC and

R&M to the Board.  *Id.* (¶ 122).  After reviewing that information, the Board determined

that SMAC was responsible for withdrawal liability, and in January 2022, the Board sent

SMAC a Notice and Demand for Payment of Withdrawal Liability in the amount of

$610,225.  ECF No. 88-10, at PageID.3003-08.  That letter explained that SMAC was

liable for a complete withdrawal as of the plan year of August 1, 2018, and payment

was due on or before March 1, 2022, even if SMAC requested a review of the

withdrawal liability.  *Id.* at PageID.3003-04.  It also detailed the construction industry

exception to withdrawal liability and noted that while SMAC "may qualify as a

building and construction industry employer," the Board determined that the exception

did not apply because SMAC or a successor employer had "continued to perform work

for which contributions previously were required" which "triggered a complete

withdrawal even under the special rule for building and construction industry

employers."  *Id.* at PageID.3005.  Finally, the demand letter noted that the Board had

"identified" R&M as a "following affiliated business or successor employer" that was also responsible for SMAC's withdrawal liability. *Id.*

SMAC and R&M requested that the Board review the withdrawal liability in April 2022. ECF No. 88-20, at PageID.3082-88. They contended that SMAC should not be subject to withdrawal liability because of the construction industry exemption. *See id.* at PageID.3084. And they maintained that SMAC and R&M were "completely different entities having different sets of incorporators, business types, officers, and locations," and therefore R&M could not be considered a successor employer to SMAC that would be responsible for the withdrawal liability. *Id.* at PageID.3085.

In July 2022, while this review was pending, the Board sent a Notice of Delinquency and Demand for Immediate Payment of Outstanding Withdrawal Liability Amounts to counsel for SMAC and R&M. ECF No. 87-16, at PageID.1735-36. Three months later, in October 2022, the Board denied SMAC and R&M's request for review of the withdrawal liability determination. ECF No. 84-1, at PageID.665 (Pl.'s CSF ¶ 129). Thereafter, SMAC and R&M did not initiate arbitration or make any payments towards the withdrawal liability. *Id.* (¶ 130). And so the Board initiated this action in February 2023, seeking recovery of the withdrawal liability of $610,255. *Id.* (¶ 131); *see* ECF No. 1. A first amended complaint—which is the operative complaint—was filed in October 2024. ECF No. 76. It names SMAC, R&M, M&M, Melvin, Margaret, and Meghan as Defendants. And it requests, among other things, joint and several liability against

Defendants in the full amount of the withdrawal liability, together with interest,

liquidated damages, and attorney's fees and costs.  *Id.* at PageID.582.

Before the court are the parties' cross-motions for summary judgment.  ECF Nos.

84, 99.  The court held a hearing on these motions on June 6, 2025.  ECF No. 114.

## SUMMARY JUDGMENT STANDARD

Summary judgment will be granted to a moving party that shows "there is no

genuine dispute as to any material fact" and that they are "entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(a).  The moving party initially bears the burden of

showing there are no genuine disputes of material fact.  *See Celotex Corp. v. Catrett*, 477

U.S. 317, 323 (1986).  If the movant makes that showing, the burden shifts to the

opposing party, who must "set forth specific facts that show a genuine issue for trial."

*Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002) (cleaned up).  This burden "is

not a heavy one," as "the nonmoving party simply is required to show specific facts, as

opposed to general allegations, that present a genuine issue worthy of trial."  *Dark v.*

*Curry Cnty.*, 451 F.3d 1078, 1082 n.2 (9th Cir. 2006) (cleaned up).  But if the non-moving

party altogether fails to defend claims or forms of relief against which summary

judgment has been sought, they are deemed "abandoned."  *Jenkins v. Cnty. of Riverside*,

398 F.3d 1093, 1095 n.4 (9th Cir. 2005); *see also Shakur v. Schriro*, 514 F.3d 878, 892 (9th

Cir. 2008) (explaining that "a plaintiff has abandoned claims by not raising them in

opposition to the defendant's motion for summary judgment" (cleaned up)).

It is not for the court at summary judgment to "weigh conflicting evidence with respect to a disputed material fact," nor to assess the credibility of the evidence—those are determinations best left for the factfinder. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). When reviewing cross-motions for summary judgment, the court "evaluate[s] each motion independently, 'giving the nonmoving party in each instance the benefit of all reasonable inferences.'" *Lenz v. Universal Music Corp.*, 801 F.3d 1126, 1130-31 (9th Cir. 2015) (quoting *Am. C.L. Union of Nev. v. City of Las Vegas*, 333 F.3d 1092, 1097 (9th Cir. 2003)). And if the facts and reasonable inferences drawn in the nonmoving party's favor show that "a rational trier of fact might resolve the issue in favor of the nonmoving party, summary judgment must be denied." *T.W. Elec. Serv.*, 809 F.2d at 631.

**DISCUSSION**

**A.    The Arbitration Requirement**

In their summary judgment papers, Defendants contend that the Board's imposition of withdrawal liability on SMAC and R&M may be held improper as a matter of law. They alternatively argue that, as a matter of law, the remaining Defendants—M&M, Melvin, Margaret, and Meghan—should not be held jointly and severally liable for it. And the Board's cross-motion for summary judgment takes the

opposite position, arguing that withdrawal liability on SMAC and R&M, and joint and several liability on the remaining Defendants, should be affirmed as a matter of law.

Before turning to the arguments concerning joint and several liability, the court takes up the issue of whether there is a triable issue on withdrawal liability for SMAC and R&M. The threshold question here is whether SMAC and R&M have waived their ability to challenge the withdrawal liability through their failure to initiate arbitration.

The MPPAA provides that "[a]ny dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 1381 through 1399 of this title shall be resolved through arbitration." 29 U.S.C. § 1401(a)(1). An employer may not end-run this arbitration requirement by waiting until a court proceeding to raise arguments for the first time; an "employer that fails to initiate arbitration in a timely manner waives defenses and objections that must have been raised in arbitration." *Pension Tr. Fund for Operating Eng'rs v. Dalecon, Inc.*, No. C 11-02851, 2014 WL 1007274, at *7 (N.D. Cal. Mar. 12, 2014). Although this is a "harsh result," it "is largely a self-inflicted wound." *Bd. of Trs. of Constr. Indus. & Laborers Joint Pension Tr. for S. Nev. v. Recreation Dev. Co., LLC*, No. 22-cv-00052, 2023 WL 2226848, at *4 (D. Nev. Feb. 24, 2023) (cleaned up).

There is no question that this arbitration requirement applies to disputes concerning withdrawal liability. The statute explicitly covers "a determination made under section[] 1381." 29 U.S.C. § 1401(a)(1). And withdrawal liability is governed by

§ 1381.  For that reason, the Ninth Circuit has confirmed that "[a]ny dispute over the employer's withdrawal liability must be resolved by arbitration."  *Penn Cent. Corp. v. W. Conf. of Teamsters Pension Tr. Fund*, 75 F.3d 529, 532 (9th Cir. 1996).

The foregoing leaves SMAC without a defense to withdrawal liability:  There is no dispute that SMAC was an "employer" within the meaning of the MPPAA.  Nor is there any dispute that SMAC failed to initiate arbitration and that the time for doing so has expired.[3]  And while SMAC raises four separate arguments against withdrawal liability, each should have been raised first in arbitration.  SMAC's arguments against withdrawal liability are therefore waived.

First, SMAC argues that the Board erroneously calculated the amount of withdrawal liability due.  *See* ECF No. 99, at PageID.3389.  But any dispute as to the amount of withdrawal liability, or how it was calculated, must be arbitrated.  *See Operating Eng'rs' Pension Tr. Fund v. Clark's Welding & Mach.*, 688 F. Supp. 2d 902, 909 (N.D. Cal. 2010) ("Disputes that have to be arbitrated concern the establishment, computation and collection of withdrawal liability." (cleaned up)).  Because SMAC did not initiate arbitration and raise this issue in that forum, it has waived any such dispute.

---

[3]     A party must commence arbitration within sixty days "after the employer is notified of the [multiemployer pension plan] sponsor's final determination concerning withdrawal liability (or 120 days after the employer requested the sponsor to review the matter, whichever date is earlier)."  *Dalecon*, 2014 WL 1007274, at *16; *see* 29 U.S.C. § 1401(a)(1).  Both of those deadlines have long passed.

Second, SMAC contends that the Board brought this lawsuit too late.  *See* ECF No. 99, at PageID.3392-94.  Relying on the affirmative defense of laches, SMAC argues that the Board's delay in providing notice of the withdrawal liability should bar the action.[4]  *See* ECF No. 109, at PageID.3754-57.  It points to 29 U.S.C. § 1399(b)(1), which requires pension fund plan sponsors to notify the employer of the "amount of the liability" and the schedule for those payments "as soon as practicable after an employer's complete or partial withdrawal."  But here again, the argument that notice of withdrawal liability was not given "as soon as practicable" should have been submitted to arbitration.  *See Recreation Dev. Co.*, 2023 WL 2226848, at *5.  That is because SMAC is once again challenging the Board's imposition of withdrawal liability, that determination was made under § 1381, and disputes concerning a determination under § 1381 must be arbitrated.  And even if it could be said that this argument arose under § 1399 instead, that would not avail SMAC:  the statutory language compelling arbitration covers disputes not only under § 1381, but also under § 1399.  *See* 29 U.S.C.

---

[4]     Relatedly, Defendants argue that the Board fraudulently induced SMAC into withdrawing from the fund and incurring withdrawal liability.  *See* ECF No. 99, at PageID.3389-91.  But at the hearing on these cross-motions, Defendants' counsel could not point to evidence or caselaw to support that contention.  Instead, Defendants' citations to the emails between the Board's representatives and SMAC, via Margaret, show the opposite:  that the Board accurately warned SMAC of the consequences of withdrawal liability before officially terminating SMAC as a union signatory.  And the court sees no other evidence in the record, nor has it found another legal basis, to support Defendants' contention.  The court therefore concludes that this argument is not only waived for failure to arbitrate, but also without merit as a matter of law.

§ 1401(a)(1).  Accordingly, a defense of laches must be arbitrated, and SMAC's failure to initiate arbitration means that it has waived that defense.[5]

Third, SMAC argues that it "did not permanently cease operations" and thus never "effectuate[d] a complete or partial withdrawal."  ECF No. 99, at PageID.3388 (capitalizations omitted).  Once again, this argument challenges the Board's withdrawal liability determination under § 1381 and is waived because SMAC failed to arbitrate.  And to the extent it could be viewed instead as a determination rising under § 1383(a)—the section defining a "complete withdrawal"—that does not advance SMAC's position, because the arbitration requirement extends to determinations under § 1383(a).  *See* 29 U.S.C. § 1401(a)(1) (covering "sections 1381 through 1399").

Fourth, and finally, SMAC challenges the Board's determination that SMAC was ineligible for the construction industry exception under § 1383(b).  *See* ECF No. 99, at PageID.3388; ECF No. 109, at PageID.3757-58.  But challenges to determinations under

---

[5]    A statute of limitations argument, by contrast, would not have to be arbitrated.  But Defendants have no valid statute of limitations argument.  The applicable statute of limitations, 29 U.S.C. § 1451, begins to run not on "the date the employer withdraws from the plan," but rather when "the employer fails to make a payment on the schedule set by the fund."  *Bay Area Laundry*, 522 U.S. at 195.  In this case, the pension fund's cause of action began to accrue on March 1, 2022, when Defendants first failed to make a withdrawal liability installment payment.  The Board filed this action less than one year later, on February 8, 2023, well within the statute of limitations period.

§ 1383(b)—no less than § 1383(a)—must first be submitted to arbitration. By failing to arbitrate this issue, SMAC waived its right to litigate it in court.

Defendants offer no meaningful opposition to any of the above conclusions. But in their reply brief, they argue that the arbitration requirement violates the "equal protection clause to the United States Constitution," ECF No. 109, at PageID.3761, by which they apparently refer to the equal-protection principle that the Supreme Court has recognized within the Fifth Amendment's due process clause. *See, e.g.*, *Bolling v. Sharpe*, 347 U.S. 497 (1954). This argument need not detain us long. For one thing, Defendants forfeited the argument by failing to raise it until their reply brief. *See Martinez Lopez v. Randstad US, L.P.*, 822 F. App'x 518, 520 (9th Cir. 2020). For another, the argument is meritless. Neither a fundamental interest nor a suspect classification is in play, and rational basis review therefore applies. *See Heller v. Doe by Doe*, 509 U.S. 312, 319-20 (1993). Rational basis review is "a paradigm of judicial restraint," adhering to the principle that "equal protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313-14 (1993). And § 1401(a) easily passes it. Congress mandated arbitration under the MPPAA because of its "dissatisfaction with collection procedures that resulted in lengthy, costly and complex litigation." *Recreation Dev. Co.*, 2023 WL 2226848, at *4 (cleaned up). Placing the burden on employers to seek arbitration is plainly rational, given that employers are often in possession of the best information needed to

19

determine whether the amount calculated was in fact, incorrect, or whether a particular

exception to withdrawal liability might apply.  *Cf. Concrete Pipe & Prods. of Cal., Inc. v.*

*Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 626 (1993) ("It is indeed entirely

sensible to burden the party more likely to have information relevant to the facts about

its withdrawal from the Plan with the obligation to demonstrate that facts treated by the

Plan as amounting to a withdrawal did not occur as alleged.").  And backing that

requirement up with a waiver penalty is rationally related to the aim of encouraging

parties to comply with it.

*    *    *

The upshot is that SMAC has not preserved any argument against the imposition

of withdrawal liability or the Board's calculation of the amount owed.  Its liability is

settled as a matter of law, and SMAC must pay the amount of withdrawal liability the

Board assessed.  The court therefore GRANTS the Board's motion for summary

judgment against SMAC on assessment of withdrawal liability.

A similar conclusion may well follow for R&M:  the Board determined that it

owed withdrawal liability as a successor entity to SMAC, and R&M failed to seek

arbitration to challenge the Board's withdrawal liability determination.  But R&M

challenges that reasoning, arguing that it should not have had to seek arbitration since

the very question of whether it was a successor is in dispute.  R&M further argues that

successor liability must be determined in court, rather than through arbitration.

20

The court declines to resolve whether R&M should have initiated arbitration under these circumstances.  It is enough to note that SMAC's withdrawal liability is legally settled because of SMAC's failure to arbitrate.  Given that SMAC's withdrawal liability can no longer be challenged, R&M's only available defense is that it is not jointly and severally liable for SMAC's withdrawal liability.  The same holds for the other Defendants:  it is too late to challenge SMAC's withdrawal liability, so the only question is whether the other Defendants are jointly and severally liable with SMAC.  We therefore turn next to the issue of joint and several liability.

**B.     Common Control**

The Board advances a number of legal theories to support its argument that R&M, M&M, Melvin, Margaret, and Meghan are jointly and severally liable with SMAC.  We will start with the Board's arguments concerning "common control."  Here, the Board argues that Melvin and Margaret owned two unincorporated businesses—M&M and a rental and investment property partnership—that were part of a common control group with SMAC, and those businesses are therefore jointly and severally liable for SMAC's withdrawal liability.  The Board further argues that Melvin and Margaret are themselves jointly and severally liable given the liability of their unincorporated businesses.

1.  Under ERISA, an "employer" responsible for withdrawal liability includes any trade or business that is part of a common control group.  *See* 29 U.S.C. § 1301(b)(1)

("[A]ll employees of trades or businesses (whether or not incorporated) which are under *common control* shall be treated as employed by a single employer and all such trades and businesses as a single employer." (emphasis added)).  That is, "[t]rades and businesses 'under common control' are treated as a single employer and are jointly and severally liable for one another's withdrawal liability."  *Bd. of Trs. of Cal. Ironworkers Field Pension Tr. v. M.M. Stevens, LLC*, No. CV 16-07791, 2017 WL 4443086, at *2 (C.D. Cal. Oct. 4, 2017).  So here, any entity within a common control group with SMAC would be jointly and severally liable for SMAC's withdrawal liability.  *See id.*; *see also Allyn Transp. Co.*, 832 F.2d at 506 (noting that any entity within a common control group will be on actual notice of withdrawal liability because "notice to any member of a controlled group constitutes notice to all").

One type of common control group is a "brother-sister" group, which involves "two or more organizations conducting trades or businesses" in which five or fewer individuals hold a controlling interest in each organization and have "effective control" of each organization.  26 C.F.R. § 1.414(c)-2(c)(1); *see Bd. of Trs. of W. Conf. of Teamsters Pension Tr. Fund v. Lafrenz*, 837 F.2d 892, 893 (9th Cir. 1988).[6]

---

[6]    Contrary to Defendants' assertion, there is no requirement that the entities have "significant operational and financial integration."  ECF No. 99, at PageID.3387.  *See Lafrenz*, 837 F.2d at 895 (9th Cir. 1988) (agreeing "with the district court that section 1301(b)(1) does not require that commonly controlled businesses be economically related").

A "controlling interest" is defined, in the case of a corporation, as "ownership of stock possessing at least 80 percent of total combined voting power of all classes of stock entitled to vote of such corporation or at least 80 percent of the total value of shares of all classes of stock of such corporation"; for a partnership, as "ownership of at least 80 percent of the profits interest or capital interest of such partnership"; and for a sole proprietorship, as "ownership of such sole proprietorship."  26 C.F.R. § 1.414(c)-2(b)(2)(i).  Ownership "includes both direct ownership and ownership" as defined by 26 C.F.R. § 1.414(c)-4, which sets out the rules for determining ownership, and, importantly, "an individual shall be considered to own an interest owned by or for [their] spouse."  *M.M. Stevens*, 2017 WL 4443086, at *3 (cleaned up).

Effective control means either:  (1) "[i]n the case of an organization which is a corporation, such persons own stock possessing more than 50 percent of the total combined voting power of all classes of stock entitled to vote or more than 50 percent of the total value of shares of all classes of stock of such corporation"; or (2) "[i]n the case of an organization which is a partnership, such persons own an aggregate of more than 50 percent of the profits interest or capital interest of such partnership."  26 C.F.R. § 1.414(c)-2(c)(2).[7]

---

[7]    At the hearing on these motions, Defendants' counsel acknowledged that Defendants' briefing does not challenge the validity of any of these regulations under *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024), or on any other ground.  And while Defendants' counsel suggested for the first time during the hearing that the regulations

2.   Under these legal standards, there is no genuine dispute of material fact that Melvin and Margaret's unincorporated businesses qualify as having been in a common control group with SMAC.

To begin with, there is no dispute that Melvin was the 100 percent owner of SMAC from 2003 until its closing.  Under the applicable regulations, Melvin's spouse, Margaret, is attributed that same 100 percent interest.  *See id.* § 1.414(c)-4(b)(5)(i) ("[A]n individual shall be considered to own an interest owned, directly or indirectly, by or for his or her spouse . . . .").  And because of their shared 100 percent ownership, including ownership of all of SMAC's stocks, they had effective control over SMAC.  *See* 26 C.F.R. § 1.414(c)-2(c)(2)(i); ECF No. 84-13, at PageID.1187-95.

Nor is there any question that Melvin and Margaret's rental and investment property partnership was within the common control group with SMAC.  It is undisputed that Melvin and Margaret owned three rental and investment properties, one of which was leased to SMAC, and their joint venture thus constitutes a "trade or business."  *See Pension Ben. Guar. Corp. v. Ctr. City Motors, Inc.*, 609 F. Supp. 409, 412 (S.D. Cal. 1984) ("[T]he court finds that Congress did not intend to exclude from its definition of a 'trade or business' in § 1301, a rental proprietorship which leases property, under a net lease, to an entity that is under common control."); *Lafrenz*, 837

---

might be inconsistent with statutory language, he neither identified any actual conflict nor any argument to that effect in his briefing.  Any such argument is therefore forfeited.

F.2d at 894 (noting that ERISA "does not distinguish between active and passive

investments").  Given their 100 percent ownership of both SMAC and this rental and

investment property partnership, they clearly meet the first element of the brother-sister

control group test:  both businesses were owned by five or fewer persons (in this case,

two) who, together, owned at least 80 percent of the profits interest or capital interest of

the partnership.  And Defendants do not contest that Melvin and Margaret had

"effective control" of the investment property group for the same reason.  It follows that

Melvin and Margaret's property partnership was in a common control group with

SMAC.  *See Lindquist*, 2011 WL 2884850, at *5 (holding that individual who leased

property to company responsible for withdrawal liability was in common control group

and noting that "to hold otherwise would thwart the purpose of § 1301(b)(1) by

allowing controlling shareholders to evade withdrawal liability by maintaining

property under separate ownership and leasing it to the company").[8]

---

[8]     The Board separately seeks to recover from the rental and investment property partnership without regard to an August 2021 transfer of 98 percent of Margaret and Melvin's interest in an investment property on Alaa Street to Meghan.  *See* ECF No. 84 n.6, at PageID.650; ECF No. 84-1, at PageID.665 (Pl.'s CSF ¶ 123); ECF No. 87-15, at PageID.1723-25.  It is true that under § 1392(c) of ERISA, "[i]f a principal purpose of any transaction is to evade or avoid liability under this part, this part shall be applied (and liability shall be determined and collected) without regard to such transaction."  But "whether the purpose of a transaction is to 'evade or avoid liability' is a mixed question of law and fact," and the court concludes that the factual component here raises genuine disputes of material fact.  *Cent. States, Se. & Sw. Areas Pension Fund v. F.C.J. Props., Inc.*, No. 17-cv-5320, 2019 WL 1425444, at *3 (N.D. Ill. Mar. 29, 2019).  On the one hand, it is undisputed that the Board notified Margaret and Melvin that withdrawal liability

Finally, the court concludes that M&M was in the common control group with

SMAC. It is undisputed that Melvin was the owner of M&M, a sole proprietorship, and

the sole owner of SMAC—and because both entities are owned by five or fewer people

(that is, Melvin alone) and he had "effective control" of both, they were in a common

control group. *See* ECF No. 84-1, at PageID.660 (Pl.'s CSF ¶ 6, 31). Margaret is liable for

Melvin's interest in M&M because she "was an agent of M&M" as "an authorized

signatory on its account," and "she signed checks" for M&M. *Id.* (¶ 31); *see also* ECF No.

92-2, at PageID.3312 (document appointing Margaret as agent for M&M). She thus

acted in a fiduciary capacity and "participate[d]in the management" of M&M, and as a

result, she is attributed ownership of the entity. 26 C.F.R. § 1.414(c)-4(b)(5)(ii)(B).

\*     \*     \*

In short, SMAC, M&M, and Melvin and Margaret's rental and investment

property partnership were in a common control group. As such, each entity is liable for

_____

would likely be imposed on SMAC as early as the fall of 2020, and this transaction
occurred in August 2021. And so a factfinder could readily infer that Meghan and
Melvin transferred nearly the entirety of their interest in the property to Meghan with
the principal purpose of evading the collection of the withdrawal liability amount.

But on the other hand, the Board did not send its official notice of withdrawal
liability until July 2022, and Margaret explained in her deposition that the transfer of
the Alaa property to Meghan was done out of financial hardship. *See* ECF No. 84-7, at
PageID.1050-51. Were a factfinder to credit testimony along these lines, it could
conceivably conclude that the principal purpose of the transaction was not to evade or
avoid liability (however unlikely it may be that a factfinder would reach that
conclusion).

Because the court may not make credibility determinations at summary
judgment, it DENIES summary judgment to the Board on this issue.

SMAC's withdrawal liability.[9]  And because M&M and the partnership are unincorporated businesses, Melvin and Margaret are individually jointly and severally liable for the withdrawal liability as well.  The court therefore GRANTS summary judgment to the Board and DENIES summary judgment to Defendants on these grounds.

### C.    Successor Liability

We turn back now to a consideration of R&M's potential liability.  The Board argues that R&M is a successor entity to SMAC, such that it should be held responsible for SMAC's withdrawal liability.  To qualify as a successor entity to SMAC, R&M "must (1) be a successor, and (2) have notice of the withdrawal liability."  *Heavenly Hana LLC v. Hotel Union & Hotel Indus. of Haw. Pension Plan*, 891 F.3d 839, 843 (9th Cir. 2018).  The court considers each of these requirements in turn.

1.    Under ERISA, "[t]here is no bright line rule for determining when to impose successor liability."  *S. Cal. Lumber Indus. Ret. Fund v. CWP Cabinets, Inc.*, No. CV 16-01005, 2017 WL 4785972, at *4 (C.D. Cal. Aug. 7, 2017).[10]  While the Ninth Circuit has

---

[9]    The Board further contends that R&M was in a common control group with SMAC when R&M was formed in 2017.  *See* ECF No. 84, at PageID.648 n.4.  Because the court below concludes that R&M is a successor with notice of withdrawal liability, it need not decide whether R&M also was part of the common control group.

[10]    Although successor liability is often considered when there is a purchase or sale of a business, the "Ninth Circuit has acknowledged that the form of transfer from one entity to another is typically not consequential to the successorship inquiry."  *CWP Cabinets*, 2017 WL 4785972, at *4.

explained that courts should apply a "flexible successorship inquiry," it has also held that "substantial continuity is the primary question, and so the most important consideration, in assessing whether an employer is a successor for purposes of imposing" withdrawal liability. *Michael's Floor Covering, Inc.*, 801 F.3d at 1095 (cleaned up). Courts consider the following factors in determining whether a new business is a successor: "whether the business of both employers is essentially the same; whether the employees of the new company are doing the same jobs in the same working conditions under the same supervisors; and whether the new entity has the same production process, produces the same products, and basically has the same body of customers." *Id.* (cleaned up).

In this case, the following facts are undisputed: SMAC and R&M provided nearly identical services in the same geographical location, in the city of Kapolei on Oʻahu. ECF No. 84-1, at PageID.660-61 (Pl.'s CSF ¶¶ 10, 36). They had the same phone number. ECF No. 84-5, at PageID.782, 797. They used the same office equipment, machinery, and cars, a majority of which R&M received from SMAC at no cost. *See, e.g.,* ECF No. 84-6, at PageID.907-08. They used the same suppliers, whose information was kept in the same database for both entities, and they used the same database to track customer jobs. ECF No. 84-1, at PageID.663 (Pl.'s CSF ¶¶ 96, 98).

Importantly, SMAC and R&M share the same business functions. SMAC "provided sheet metal and air conditioning services for residential and commercial

28

projects," and R&M also "provides sheet metal and air conditioning services for

residential and commercial projects," and both provided those services in and around

Kapolei. *Id.* at PageID.660-61 (¶¶ 10, 36). Both SMAC and R&M offer sheet metal work,

residential air conditioning installation, maintenance, and repair, as well as commercial

air conditioning installation, maintenance, and repair. *See* ECF No. 84-5, at PageID.774;

*id.* at PageID.795. When former SMAC customers called in to the phone number that

R&M now uses, Yoza explained that if there was "air conditioning that we [SMAC]

installed and it needed to be serviced or repaired," then R&M "could do it," and she

would "schedule the work to be done" by R&M. ECF No. 84-6, at PageID.938-99. These

facts weigh heavily in favor of finding that R&M is a successor. *See Carpenters Health &

Sec. Tr. of W. Wash. v. Paramount Scaffold, Inc.*, 159 F. Supp. 3d 1229, 1236 (W.D. Wash.

2016) (holding that entity was successor where there was "significant cross-over in the

services formerly offered by [the predecessor entity] and now offered" by the successor

entity).

    The most important factor for the court to consider is the overlap in customers

between SMAC and R&M. The Ninth Circuit has noted that in the context of MPPAA

successor determinations, "[t]he customer base inquiry is critical . . . because it is

pertinent to the statutory concern with continuity of contribution rates when business

changes take place." *Michael's Floor Covering*, 801 F.3d at 1097. Ideally, a court should

not just look at "a simple headcount of the number of customers." *Id.* Rather, in the

MPPAA context, "a measure of the billings on the jobs worked for continuing customers by the old and new companies is more useful, as pension fund contributions are usually made based on the total employee hours worked." *Id.*

Here, the Board does not offer evidence of the precise share of work—in terms of market share and number of hours of work—that R&M took over from SMAC's unionized workforce. But there is evidence in the record that R&M effectively captured the same part of the market that SMAC had serviced before, and Defendants point to no evidence to the contrary. It is undisputed, for example, that "[m]any of SMAC's long-time repeat customers sought similar services from R&M after SMAC stopped operating." ECF No. 84-1, at PageID.663 (Pl.'s CSF ¶ 95). Indeed, there are forty-seven common customers between the entities. ECF No. 86-19, at PageID.1464-65. While the Board does not offer "a measure of the billings on the jobs worked for continuing customers" by R&M, compared to what would have been union employee hours at SMAC, the record makes clear that this overlap in customers is not accidental.

R&M took up shop where SMAC left off: it shares the same phone number, core employees, and SMAC's goodwill. When customers call SMAC's phone number and learn that the entity has a different name, but that Melvin still works there and that R&M can provide the needed services, they simply contract with R&M, where they would have contracted with SMAC. *See, e.g.*, ECF No. 84-6, at PageID.915; *id.* at PageID.920. As another example, Margaret negotiated a contract on behalf of R&M to

provide air conditioning services to Euram, Inc., which had formerly been a significant

repeat customer with SMAC—and that $9,000-per-month contract for R&M was entered

into at the same time that Margaret negotiated a separate contract for SMAC to provide

$265 quarterly air conditioning services for Euram, Inc.'s owner's personal residence.

*See* ECF No. 84-1, at PageID.662 (Pl.'s CSF ¶¶ 70, 78).  By providing the same services to

the same customers as SMAC, R&M effectively held itself out as a business with a new

name, but the same reliable team and work.  And where a successor is "able to retain

many of [a prior entity's] customers, in large part because of its personal and business

relationships," those facts will "point toward finding [the subsequent entity] was a

successor."  *Michael's Floor Covering*, 801 F.3d at 1097-98 (cleaned up).

To be sure, Defendants claim that they did not actively solicit customers from

SMAC.  But that does not matter.  The successorship inquiry focuses on the capture of

the predecessor's customer base, not how *active* that capture was:  by doing the same

work that SMAC, the union employer, would have done, R&M acted as a successor by

"threatening the plan's funding base by successfully leveraging factors pertinent to

obtaining its predecessor's market share."  *Id.* at 1097.  And while R&M's capture of

SMAC's customer base may not have been especially active, it was not sheer

coincidence, either.  As noted, R&M used the same phone number that SMAC had used,

and so customers naturally called R&M while intending to call SMAC.  Under these

circumstances, the court concludes that the customer market share factor weighs

heavily in favor of finding that R&M is a successor to SMAC.

The remaining factors—continuity of the workforce and differences in

ownership—do not materially sway the successor analysis.

Although the continuity of workforce analysis should focus on whether "a

majority of the new workforce once worked for the old employer," the Ninth Circuit

has explained that "only employees in the bargaining unit," or employees "as to whom

pension fund contributions would be due—should be included in the workforce

continuity test." *Id.* (cleaned up). Here, then, while R&M employs "a majority of the

new workforce [that] once worked for the old employer," those employees—Margaret,

Melvin, and Yoza—were not union workers. *See* ECF No. 84-6, at PageID.893; ECF No.

100, at PageID.3424 (Defs.' CSF ¶ 105). Those facts weigh against a finding of

successorship to the extent that R&M does not employ any old union workers directly;

but then again, SMAC similarly did not employ union workers in its core group of

administration—it hired union workers to perform the jobs that now only Melvin, a

nonunion worker, performs. This element, then, is not particularly helpful in this case.

The different ownership between the two entities does not weigh heavily in

either direction, either. That is especially true because the Ninth Circuit has stated that

in the MPPAA context, ownership is not dispositive. *See Michael's Floor Covering*, 801

F.3d at 1099 ("The successorship test in the MPPAA context does not require

that . . . both entities have basically the same owners and operators." (cleaned up)).

Here, Melvin was the sole owner of SMAC, while Margaret and Meghan now co-own

R&M.  But while Melvin is not the owner of R&M on paper, the evidence is undisputed

that both he and Margaret functionally "take on the responsibilities of owners."  ECF

No. 84-1, at PageID.663 (Pl.'s CSF ¶ 90).  So any parsing of the difference between

Melvin's role in making decisions for SMAC and his leadership at R&M does not weigh

strongly in favor of or against successor liability.

On this record, the court finds there are no genuine issues of material fact that

R&M is a successor of SMAC because of the substantial continuity in the work provided

by R&M, as well as its capture of the same market area and customers that SMAC once

serviced.

2.  The remaining question is whether, as a successor, R&M had sufficient notice

of withdrawal liability.

Notice of withdrawal liability can be proven in one of two ways.  Actual notice

can be proven "by pointing to the facts that conclusively demonstrate actual

knowledge" by the successor of the predecessor's withdrawal liability.  *Resilient Floor

Covering Pension Tr. Fund Bd. of Trs. v. Michael's Floor Covering, Inc.*, No. 11-cv-05200,

2016 WL 5407848, at *5 (N.D. Cal. Sept. 28, 2016), *aff'd,* 707 F. App'x 859 (9th Cir. 2017)

(cleaned up).  Constructive notice, on the other hand, exists "when three conditions are

met:  (1) the purchaser qualifies as a successor; (2) the relevant pension plan is

underfunded; and (3) a purchaser using reasonable care or diligence would have discovered the withdrawal liability." *Heavenly Hana*, 891 F.3d at 847. Successors "are deemed to have notice of any facts that one using reasonable care or diligence should have." *Id.* at 845 (cleaned up). Even if there is constructive notice, however, successor liability will "only be imposed when it is fair to do so." *Id.* at 847.

A successor need not have had "notice prior to the transfer of the business." *Resilient Floor Covering Pension Fund v. TD Sports Grp., LLC*, No. 22-cv-04649, 2025 WL 452511, at *8 (N.D. Cal. Feb. 6, 2025) (cleaned up). Instead, "the notice requirement may be satisfied if a successor is able to consider information about the liability before deciding to continue the predecessor's business." *Id.* (cleaned up). Importantly, "notice to the withdrawing employer is notice to all members of the controlled group" of corporations. *Heavenly Hana*, 891 F.3d at 845-46 (cleaned up).

The court finds that R&M, as a successor, had at least constructive notice of SMAC's withdrawal liability. The first element of constructive notice has been met because the court has already determined that R&M was a successor to SMAC. The second element is also met because there is no dispute that the pension fund was underfunded. That leaves the third element: whether an objective party in R&M's position using reasonable care or diligence would have discovered the withdrawal liability. And the record makes clear that R&M had the information to know that SMAC was subject to withdrawal liability.

First consider Margaret's knowledge, which is important because of her role as a co-owner of R&M.  In June 2020, Margaret told the Union that SMAC had ceased operations, and by September 2020, she had requested termination of SMAC's signatory agreement with the Union.  ECF No. 84-1, at PageID.664 (Pl.'s CSF ¶¶ 116-17).  Margaret was told that "[w]hen a signatory company requests termination and continues working as a non-union, [the company is] subject to Pension Withdrawal Liability fees . . . that can be quite substantial."  *Id.* (¶ 119).  Margaret confirmed that SMAC was withdrawing from the fund, and she told the Board that R&M was a separate entity with different owners, so it should not be liable for withdrawal liability.  *Id.* (¶ 120).  These facts show that at least by the date of those exchanges in October 2020, a reasonable person in Margaret's position—that is, as an owner of R&M—would have been aware that SMAC was liable for withdrawal liability because R&M was continuing to perform jurisdictional work as a non-union employer; and that R&M would also be responsible for that withdrawal liability.  And despite that constructive knowledge, Margaret chose to allow R&M to continue operating as SMAC's successor.

Defendants resist this conclusion by pointing to Margaret's deposition testimony, in which she stated that she did not know what withdrawal liability meant until those fall 2020 communications.  *See* ECF No. 100-2, at PageID.3481.  Defendants' reliance on this deposition testimony falls short for three separate reasons.  First, the constructive notice standard is an objective one, meaning that Margaret's subjective lack of

knowledge of withdrawal liability is irrelevant. Second, even if Margaret only learned

about withdrawal liability in the fall of 2020, that was early enough in R&M's creation

for that entity to make a conscious decision about whether to continue operating, and

risk that liability, or close down. And, as noted, R&M continued operating long after

the fall of 2020—it is still operating today. Finally, there are additional undisputed facts

in the record showing that a reasonable person in Margaret's position would have been

aware of the fact of withdrawal liability before the fall of 2020: It is undisputed that

Margaret sent SMAC's union employee contribution reports to the pension fund. ECF

No. 84-1, at PageID.660 (Pl.'s CSF ¶ 25). It is also undisputed that Margaret "submitted

Fringe Benefit contribution reports reporting zero hours for SMAC's Union employees

until February 2020." *Id.* at PageID.664 (¶ 115). She also signed a personal guarantee

for SMAC's Union trust fund payments. ECF No. 88-10, at PageID.3013-14. And

Margaret was, of course, undisputedly aware of the nature of R&M's operations—as

well as the fact that R&M was effectively operating as SMAC's successor. A reasonable

person with awareness of these facts would have been on notice that R&M, by

operating in this manner, would cause SMAC to lose its construction industry exception

to withdrawal liability and that R&M, too, would be liable as a successor. On the

current record, then, there are no genuine issues of material fact that Margaret had

constructive knowledge of withdrawal liability, even if she was subjectively unfamiliar

with the relevant legal concepts. *See generally Bd. of Trs. of Auto. Mechanics' Loc. No. 701*

*Union & Indus. Pension Fund v. Full Circle Grp., Inc.*, 826 F.3d 994, 997 (7th Cir. 2016)

(holding that the "lack of familiarity with the concept of withdrawal liability cannot be

an excuse" that an individual does not have notice of withdrawal liability, particularly

when they know that they are "dealing with a union pension fund").

The conclusion that R&M had constructive notice is strengthened by the fact that

Melvin, too, was on constructive notice of SMAC's withdrawal liability.  Although

Melvin is not an owner of R&M, the record establishes that as a matter of law, his

involvement in R&M is significant enough that notice to him may be imputed to

R&M—particularly since R&M operated as a successor to an entity Melvin wholly

owned.  *See TD Sports Grp.*, 2025 WL 452511, at *8 (finding successor was on

constructive notice where employee was co-owner of predecessor and then became the

responsible managing employee at successor "several years before [predecessor's]

withdrawal liability was officially incurred").  For the fifteen years that Melvin owned

SMAC, the company made contributions to the pension fund.  Melvin signed multiple

documents (including personal guarantees) agreeing to pay those contributions.  *See,*

*e.g.*, ECF No. 88-10, at PageID.3010-12.  And again, the court need not doubt Melvin's

subjective statements that he did not recall signing those documents, ECF No. 100-4, at

PageID.3560, and that he was unfamiliar with the term "withdrawal liability," *id.* at

PageID.3561-62.  It is enough that Melvin, as an owner of SMAC, made regular

contributions to the pension fund.  *See TD Sports Grp.*, 2025 WL 452511, at *8

37

("Contributing to an underfunded union pension fund as an employer reasonably should have alerted [the co-owner of a predecessor company and responsible managing employee of a successor entity] to the possibility of withdrawal liability." (cleaned up)). Because Melvin was the owner and responsible managing employee at SMAC, and continued to be the responsible managing employee at R&M, his knowledge of SMAC's pension fund obligations is sufficient to impute constructive notice of SMAC's withdrawal liability to R&M.

Defendants do not meaningfully address any of these facts, but they insist that it would be inequitable to impose joint and several liability on R&M because R&M was not created to evade SMAC's pension contributions. It is true that the "notice requirement ensures fairness by guaranteeing that a successor had an opportunity to protect against liability," *TD Sports Grp.*, 2025 WL 452511, at *8 (cleaned up), and so it should be applied with that objective in mind. But Defendants' arguments gain no traction in the record of this case. The record establishes that R&M had several opportunities to protect against liability. Both Margaret and Melvin had knowledge of the facts that put them on constructive notice of SMAC's withdrawal liability. Margaret's—and Meghan's—failure to obtain legal advice or otherwise determine whether R&M might be responsible for SMAC's withdrawal liability does not change the calculus.

The imposition of withdrawal liability is, no doubt, a considerable burden on R&M. But there is likewise no doubt that "[p]ublic policy disfavors allowing employers to withdraw from underfunded pension plans without consequence and to the detriment of workers who have provided years of service." *Westgate LVH, LLC v. Trs. of Nev. Resort Ass'n-Iatse Loc. 720 Pension Tr.*, Case No. 17-cv-01731, 2019 WL 4738013, at *6 (D. Nev. Sept. 28, 2019). That is certainly true in the building and construction industry, because if "employers continue to undertake construction work without contributing to the plan," then "the number of employee hours for which contributions are made will go down." *Michael's Floor Covering*, 801 F.3d at 1090. That is precisely the harm R&M caused here by taking on SMAC's former customers while operating as a non-union shop. Defendants' equity concerns therefore do not weigh against imposing successor liability on R&M.

For these reasons, the court concludes that R&M had notice of SMAC's withdrawal liability. And because R&M is a successor entity that had notice of withdrawal liability, the court GRANTS summary judgment to the Board and DENIES summary judgment to Defendants on this issue.

### D.    Corporate Veil Piercing

Up to this point, the court has determined that M&M, Margaret and Melvin's investment property partnership, and R&M are liable for SMAC's withdrawal liability. That means in turn that Margaret and Melvin are also individually liable. But there is a

final question of whether Meghan should be individually liable, which turns on

whether the corporate veil of R&M—of which Meghan was co-owner—should be

pierced.  The Board also contends that SMAC's corporate veil should be pierced, which

would provide a further ground on which to hold Melvin and Margaret personally

liable.[11]

"While the Ninth Circuit has not addressed whether . . . veil piercing theories are

available under the MPPAA for withdrawal liability, it has long allowed these remedies

in ERISA suits involving delinquent contributions."  *Resilient Floor Covering Pension*

*Fund v. M & M Installation, Inc.*, No. C08-5561, 2012 WL 669765, at *4 (N.D. Cal. Feb. 29,

2012).  The court sees no persuasive reason why these theories would be any less

available for withdrawal liability, and Defendants have offered none.  It therefore

concludes that veil piercing is legally available here.

And there are well-settled standards for assessing whether the corporate veil

should be pierced.  Courts generally "consider three factors:  [1] the amount of respect

given to the separate identity of the corporation by its shareholders, [2] the degree of

injustice visited on the litigants by recognition of the corporate entity, and [3] the

fraudulent intent of the incorporators."  *Bd. of Trs. of Emps.-Shopmen's Loc. 516 Pension*

*Tr. Through Galton v. Columbia Wire & Iron Works, Inc.*, 233 F. Supp. 3d 873, 883 (D. Or.

---

[11]      The Board contends that R&M is also an alter ego of SMAC.  *See, e.g.*, ECF No. 84,
at PageID.650.  But because the court has already concluded that R&M faces successor
liability, it opts not to resolve that issue.

2017) (cleaned up).  To make out this showing, a plaintiff "must prevail on the first

threshold factor and on one of the other two."  *M & M Installation, Inc.*, 2012 WL 669765,

at *6.

As to the first factor, "courts typically look to whether corporate formalities were

disregarded."  *Barnes v. Sea Haw. Rafting, LLC*, Civ. No. 13-00002, 2020 WL 6585889, at *7

(D. Haw. Nov. 9, 2020).  "Corporate formalities include keeping separate corporate

records, issuing stock, avoiding commingling of funds, and maintaining the formal

roles of corporate officials."  *Trs. of Alaska Laborers Health & Sec., Ret., Training & Legal*

*Servs. Fund v. RainDance Health Care Grp., Inc.*, Case No. 09-cv-0120, 2010 WL 11619563,

at *3 (D. Alaska May 24, 2010).  The fraudulent intent element may be shown "either by

proof of fraud in the formation of the corporation *or* fraudulent misuse of the corporate

form after incorporation."  *Bd. of Trs. of Mill Cabinet Pension Tr. Fund for N. Cal. v. Valley*

*Cabinet & Mfg. Co.*, 877 F.2d 769, 773 (9th Cir. 1989).

1.  We will take up SMAC first.  There was certainly a "degree of informality"

present in SMAC's corporate operations.  *Seymour v. Hull & Moreland Eng'g*, 605 F.2d

1105, 1112 (9th Cir. 1979).  Near the end of SMAC's existence, "Melvin and Margaret

loaned money to SMAC instead of making capital contributions" and they "then

prioritized paying themselves back" before the business closed.  ECF No. 84-1, at

PageID.663 (Pl.'s CSF ¶ 101).  And Melvin and Margaret do not dispute that they "never

signed any agreements, promissory notes, or other loan documents" when making

41

financial contributions to SMAC, nor do they contest that "there were no terms for repayment, schedule, interest, or regular payments" for those contributions. *Id.* at PageID.664 (¶ 103). On occasion, when Margaret or Melvin made such a contribution, it was recorded as a "loan" in SMAC's accounting documents, but those loans were not consistently recorded as such. *Id.* (¶ 104). SMAC also does not appear to have kept a record of capital contributions. *See* ECF No. 84-5, at PageID.777.

At the same time, some corporate formalities for SMAC were maintained. The Board has not (at least at this summary judgment stage) offered evidence that Margaret or Melvin received, for example, "concerning interest-free loans taken from the corporation," or "a possibly questionable 'bonus'" from SMAC. *Seymour*, 605 F.2d at 1112. SMAC did keep records of at least some loans, and had a bookkeeper managing its funds—until, of course, that bookkeeper embezzled money. And the record does not undisputedly establish that SMAC was deliberately undercapitalized. *See id.* (declining to pierce corporate veil where "[t]here was no evidence of some of the more serious forms of abuse of the corporate entity" including, in particular, "no real evidence that the corporation ever owned less than an adequate amount of assets to carry on its business").

On these facts, a reasonable jury might conclude that SMAC did not sufficiently adhere to corporate formalities, but it also might conceivably conclude that SMAC did. And because this first prong is dispositive under the corporate veil-piercing doctrine,

the court DENIES summary judgment to both parties on whether SMAC's corporate

veil should be pierced.

2.    The details in the record of R&M's lack of corporate formalities, however, is

more striking.  R&M is structured as a manager-managed limited liability company,

and Meghan and Margaret each own a 50 percent ownership interest.  ECF No. 84-1, at

PageID.661 (Pl.'s CSF ¶¶ 42-43).  But at the time R&M was formed, there were no

capital contributions listed, and the company still does not maintain capital

contribution accounts.  *Id.* (¶¶ 43, 54).  Although R&M files taxes as a partnership, it

"does not send reports to its members for their personal tax returns."  *Id.* (¶ 55).  While

Meghan is a 50 percent owner, she "has never made any capital contributions to R&M,

and she does not include profits or losses from R&M on her personal tax returns."  *Id.* at

PageID.662 (¶ 63).  And R&M does not hold any formal corporate meetings.  *Id.* at

PageID.661 (¶ 58).

Further, there is a considerable amount of commingling of personal and

corporate funds between R&M and its owners.  R&M paid $1,780 for Meghan's

children's daycare expenses, and that same month, R&M "incurr[ed] insufficient fund

fees."  *Id.* at PageID.662 (¶ 59).  R&M also "paid Melvin and Margaret's mortgage on

their residence," as well as "Margaret's and Melvin's personal credit cards."  *Id.* (¶¶ 60-

61).  On occasion, "Margaret wrote checks from R&M to Melvin, Meghan, and herself

with no subject line, when R&M had insufficient funds for operating expenses."  *Id.*

43

(¶ 61).  At one point, "R&M gave Melvin $15,000 for 'rent and taxes', when R&M did

not owe rent or taxes," and there was no supporting documentation to otherwise clarify

that payment.  *Id.* (¶ 62).

Several other transactions show that R&M did not follow corporate formalities in

recording its payments, particularly to Meghan, Melvin, and Margaret.  R&M failed to

disclose income from the services that it provided in 2018, and that income did not

otherwise appear on Margaret or Meghan's personal tax returns.  *See id.* (¶ 79).  At

R&M's initiation, Melvin "loaned" $40,000 to the company, but said he did not "think

[he's] going to get it back."  *Id.* at PageID.664 (¶ 105).  And Meghan "loaned" $8,000 to

R&M which was repaid to her, but there was no mention of that loan in R&M's

corporate records; there are only records of two payments from R&M to Meghan

totaling $930 that have no supporting documentation.  *Id.* (¶ 108-109); *see Laborers Clean-

Up Cont. Admin. Tr. Fund v. Uriarte Clean-Up Serv., Inc.*, 736 F.2d 516, 524 (9th Cir. 1984)

(affirming district court's finding of lack of respect for the corporation's separate

identity where "shareholders periodically made interest-free loans to the corporation

for which no promissory notes or IOU's were given").

On this record, there is no genuine issue of material fact that R&M failed to

adhere to corporate formalities, and the Board has met its burden on summary

judgment on the threshold factor of the veil-piercing analysis.  The court therefore turns

to whether the Board can prevail on either of the latter elements.

The Board only presses the second element of the test:  it argues that R&M's

fraudulent intent can be inferred by its deliberate undercapitalization.  *See id.* (holding

that "fraudulent intent" may be proven by "the failure of the incorporators adequately

to capitalize the corporation at its inception").  "Adequate capitalization means capital

reasonably regarded as adequate to enable the corporation to operate its business and

pay its debts as they mature."  *Id.* (cleaned up).  It is true that while R&M had a few

assets at its start, including the furniture, cars, and equipment that SMAC donated to it,

there is little evidence in the record of any capitalization efforts to get R&M off the

ground.  *See id.* (affirming district court's piercing of the corporate veil where company

"may have had some meager nonliquid assets at its inception," because "the failure to

infuse it with any working capital in the form of cash or other liquid assets rendered its

initial capitalization inadequate").  Meghan stated that she did not make any capital

contributions to R&M.  ECF No. 84-10, at PageID.1131.  Margaret stated she could not

recall whether she made any capital contributions to R&M when she created it, and she

had not made any such contributions since its inception.  ECF No. 84-7, at PageID.979-

80.

On these facts, the court agrees with the Board that a reasonable jury could

readily find that Defendants acted with fraudulent intent when opening R&M.  By

Defendants' own admission, it appears that there was *no* capitalization of R&M at its

start.  Indeed, Defendants have produced no account statements from R&M at its

inception, and both Margaret and Meghan denied providing any capital contributions to R&M when founding the company. And although R&M is still currently in operation, "[r]unning profits and losses do not touch upon the adequacy of start-up capital." *RainDance Health Care Grp.*, 2010 WL 11619563, at *4. The evidence in the record therefore would strongly support a fact finder's determination that there was fraudulent intent in creating R&M.

At this stage, however, the court cannot conclude as a matter of law that the apparent undercapitalization of R&M in and of itself constitutes fraudulent intent for the purposes of piercing the corporate veil. That is because while fraudulent intent may be inferred from undercapitalization, and is perhaps highly likely to be drawn here, a fact finder is not *obligated* to make that inference—it could permissibly reject it based on witnesses' testimony or other evidence. For that very reason, courts in this circuit are "generally reluctant to pierce the veil on summary judgment, especially where fraud is alleged." *Barnes*, 2020 WL 6585889, at *10; *see also Valley Cabinet & Mfg. Co.*, 877 F.2d at 773 ("Garden variety fraud should be insufficient to pierce the corporate veil in the absence of evidence of shareholder abuse of the corporate form to defraud creditors."). And that reluctance is well placed here, for Defendants have offered at least some evidence that there was no fraudulent intent in creating R&M. *See, e.g.*, ECF No. 100-2, at PageID.3442 (Margaret explaining that she opened R&M because "we wanted to do business with a contractor's license" and Meghan "showed an interest in possible

46

project managing).  The court must therefore leave it to the fact finder to weigh the credibility of Defendants' statements and other evidence presented at trial.

Because all reasonable inferences must be drawn in favor of the non-moving party at this stage, the court finds that a rational jury could conclude that there was no fraudulent intent in R&M's formation.  It therefore DENIES summary judgment to the Board and Defendants on the issue of whether R&M's corporate veil should be pierced.

*      *      *

In sum, the court concludes that R&M, M&M, Melvin, Margaret, and their investment property partnership are all jointly and severally liable for SMAC's withdrawal liability.  But it will be up to a jury to determine whether SMAC and R&M's corporate veils may be pierced (with the most significant practical consequence being that Meghan's individual liability cannot be resolved as a matter of law at this stage).

### E.    Remedy

The final matter to address is the proper remedy.  ERISA provides that "[i]n any action under this section to compel an employer to pay withdrawal liability, any failure of the employer to make any withdrawal liability payment within the time prescribed shall be treated in the same manner as a delinquent contribution . . . ."  29 U.S.C. § 1451(b).  "In an action to enforce payment of delinquent contributions, a plaintiff is entitled to recover the unpaid contributions, interest, liquidated damages, and reasonable attorneys' fees and costs."  *Lindquist*, 2011 WL 2884850, at *7 (citing 29 U.S.C.

§ 1132(g)(2)); *see also Clark's Welding,* 688 F. Supp. 2d at 915.  Under 29 U.S.C.

§ 1132(g)(2)(C), the court "shall award" the Board the greater of either the "(i) interest

on the unpaid contributions, or (ii) liquidated damages provided for under the plan in

an amount not in excess of 20 percent (or such higher percentage as may be permitted

under Federal or State law) of the amount" of the unpaid contributions.

As a result of the court's partial grant of summary judgment to the Board, the

Board is now entitled to several forms of relief:

First, the Board is entitled to the unpaid withdrawal liability, in the amount of

$610,255.00.  ECF No. 84-1, at PageID.665 (¶ 131); *see* ECF No. 88-10, at PageID.3003-08.

And as noted above, Defendants cannot challenge the amount of the unpaid

withdrawal liability now because SMAC failed to initiate arbitration.

Second, ERISA requires the court to award interest on the unpaid liability at the

rate provided by the plan.  *See* 29 U.S.C. § 1132(g)(2)(B).  And if the plan does not

provide for a specific rate, multiemployer plans charge withdrawing employers interest

at the rates provided by the Pension Benefit Guaranty Corporation.  *See* 29 C.F.R.

4219.32; ECF No. 88-1, at PageID.1759-60.  Based on those rates, the Board has

calculated the total interest through January 15, 2025, as $123,792.95.  ECF No. 89-20, at

PageID.3172.  Because Defendants do not dispute that calculation in their opposition to

the Board's summary judgment, the court treats that figure as undisputed, and

therefore awards the Board that amount in interest.  (The Board may move to

supplement this amount to reflect the time that has passed since January 15, 2025, but it must do so within thirty days of this order).

Third, ERISA requires that the court award an amount equal to the greater of interest on the unpaid liability or liquidated damages as provided by the pension plan. 29 U.S.C. § 1132(g)(2)(C). Here, the plan provides that an "employer responsible for such delinquent contributions shall pay as damages the amount of 10% of such delinquent contributions. . . ." ECF No. 88-8, at PageID.2916. Once the calculations are all said and done, the greater amount in this case turns out to be the interest of the unpaid contributions, which is $123,792.95. *See* ECF No. 89-20, at PageID.3172. And again, Defendants do not dispute that figure.

Taking the withdrawal liability ($610,255.00), the interest ($123,792.95), and the liquidated damages ($123,792.95) together, the court finds that the Board is entitled to $857.810.90.[12] *See id.*

As a final matter, the Board is entitled to an award of reasonable attorneys' fees and costs under 29 U.S.C. § 1132(g)(2)(D). *See Trs. of Amalgamated Ins. Fund v. Geltman Indus., Inc.*, 784 F.2d 926, 931–32 (9th Cir. 1986). Here, the pension fund plan specifically states that "[i]f it is necessary to take legal action to enforce payment of contributions

---

[12]    The Board states that the total liability amount should be one cent more, though it is not clear why that would be. *See* ECF No. 89-20, at PageID.3172. Because the discrepancy is de minimis—and because the Board likely will supplement its interest and liquidated damages figures anyway—the court declines for now to give the Board that extra penny.

and damages from an employer, such employer shall pay for all . . . court costs; and

reasonable attorney's fees of 25% of the total amount of contributions and damages

due." ECF No. 88-8, at PageID.2916. The Board must move for attorneys' fees and

costs, with supporting documentation, within thirty days of this order.

## CONCLUSION

For the foregoing reasons, the court DENIES Defendants' Motion for Summary

Judgment in its entirety, and GRANTS the Board's Motion for Summary Judgment in

part and DENIES it in part:

(1)    The Board's Motion for Summary Judgment is GRANTED against

Defendants SMAC Hawaii, Inc., R&M Air Conditioning, LLC, M&M Sheet Metal

Company, Melvin E. Mung Lim, Jr., and Margaret T. Mung Lim, in the amount of

$610,255.00 in unpaid principal withdrawal liability, $123,792.95 in interest, and another

$123,792.95 in liquidated damages, for a total sum of $857.810.90.

(2)    Within thirty (30) days of this order, the Board shall file a motion for

attorneys' fees and costs with supporting documentation, and the Board may also make

a request for additional interest (as well as any adjustment to liquidated damages) in

the same motion.

(3)    The court DENIES the Board's Motion for Summary Judgment to the

extent it seeks to pierce SMAC's and R&M's corporate veils—and therefore DENIES

summary judgment against Meghan M. Mung Lim.

(4)    The court DENIES the Board's Motion for Summary Judgment to the

extent it seeks to recover from the rental and investment property partnership without

regard to the August 2021 transfer of 98 percent of Margaret and Melvin's interest in an

investment property on Alaa Street to Meghan M. Mung Lim.

Accordingly, it will be for the factfinder to resolve at trial whether the corporate

veils of SMAC and R&M should be pierced (which would result in Meghan M. Mung

Lim being personally liable) and whether the Board should be permitted to recover

from the rental and investment property partnership without regard to the August 2021

transfer.

IT IS SO ORDERED.

DATED:  July 18, 2025, at Honolulu, Hawai'i.



/s/ Micah W.J. Smith
_____
Micah W.J. Smith
United States District Judge

Civil No. 23-00076 MWJS-KJM; *Board of Trustees of the PAMCAH-UA Local 675 Pension Fund v. SMAC Hawaii, Inc.*, et al.; ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

51