IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| BOARD OF TRUSTEES OF THE PAMCAH-UA LOCAL 675 PENSION FUND,<br><br>Plaintiff,<br><br>vs.<br><br>SMAC HAWAII, INC., *et al.*,<br><br>Defendants. | Civil No. 23-00076 MWJS-KJM<br><br>POST-TRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW |

## INTRODUCTION

When a union employer withdraws from an underfunded multiemployer pension plan covered by the Employee Retirement Income Security Act of 1974 ("ERISA"), it generally becomes responsible for its share of the pension plan's financial deficit, an obligation known as "withdrawal liability."  In 2018, Defendant SMAC Hawaii, Inc. ("SMAC"), a sheet metal and air conditioning company on Oʻahu, withdrew from the PAMCAH-UA Local 675 Pension Fund (the "Pension Fund") and incurred substantial withdrawal liability.  This decision is about how far the Board of Trustees of the Pension Fund (the "Board") may go to collect it.

At an earlier point in the case, this court granted partial summary judgment to the Board, finding that it could recover withdrawal liability not only from Defendant SMAC, but also from Defendants R&M Air Conditioning, LLC ("R&M"), M&M Sheet

Metal Company ("M&M"), and Defendants Melvin E. Mung Lim, Jr. ("Melvin") and

Margaret T. Mung Lim ("Margaret"), a married couple who owned and operated

SMAC, R&M, and M&M in one combination or another.  Dkt. No. 116.  But the Board

asserts that it is entitled to recover withdrawal liability from two additional sources.  It

contends that the court should pierce the corporate veil of R&M, which the Board

alleges is a shell company, so that the Board may recover withdrawal liability from

Defendant Meghan M. Mung Lim ("Meghan"), who owns R&M with her mother,

Margaret.  And the Board also asserts that it should be able to recover without regard to

the transfer of a 98 percent interest in a Kapolei townhouse from Melvin and Margaret

to Meghan—a transaction which the Board argues had a principal purpose of evading

or avoiding withdrawal liability.

The court denied summary judgment on these two issues in July 2025 because

each turned on disputed issues of material fact.  Dkt. No. 116, at PageID.3825-26.  A

four-day bench trial was held in November 2025 to resolve the factual disputes, and the

parties filed their Proposed Findings of Fact and Conclusions of Law, as well as post-

trial briefs, on January 14, 2026.  Dkt. Nos. 179, 180, 181, 182.

The court has carefully considered the evidence presented at trial, as well as the

parties' post-trial submissions, and now issues its Findings of Fact and Conclusions of

Law as required by Federal Rule of Civil Procedure 52(a).  For the reasons that follow,

the court concludes that R&M's corporate veil should not be pierced, but that

2

withdrawal liability must be collected without regard to the challenged property transfer.

## FINDINGS OF FACT

Melvin, Margaret, and Meghan all testified at trial, and portions of their earlier deposition testimony were also admitted as evidence, along with portions of the deposition testimony of Glenda Yoza (a longtime SMAC employee) and Erinn Liu (the Pension Fund administrator).  The testimony largely focused on SMAC's operations and closure; the formation, operation, and finances of R&M; and transfer of the Kapolei property.  In addition to this testimony, the court admitted over a hundred stipulated exhibits, and several others were moved into evidence for the first time during trial.

In the paragraphs that follow, the court lays out its Findings of Fact.  The Findings rely, in part, on witness testimony.  Having observed the demeanor of Melvin, Margaret, and Meghan at trial, and having compared the substance of their testimony to the other admitted evidence, the court concludes that each of these witnesses tried—in good faith—to uphold their oaths to testify truthfully.  As to Melvin and Margaret, however, the court concludes that their recall of some events and their offered justifications for some past actions—though, in the court's view, honest renderings of their current beliefs and feelings—did not always provide a factually reliable historical record.  Indeed, at various points during trial, Plaintiff's counsel marshaled documentary evidence showing that portions of Melvin's and Margaret's testimony

3

was factually incorrect.  For that reason, the court relies on some aspects of Melvin's

and Margaret's testimony, but does not rely on others.  As to Meghan, by contrast, the

court concludes that she not only sought to testify truthfully, but also accomplished that

objective; the court finds that Meghan's testimony was reliable.

With these observations, and based on the admitted exhibits and credited aspects

of witness testimony, the court makes the following Findings of Fact:

**A.    The Board and the Pension Fund**

1.    The Pension Fund is a multiemployer employee benefit plan established

in 1963 and maintained under ERISA and the Multiemployer Pension Plan

Amendments Act of 1980 ("MPPAA").

2.    The Board administers the Pension Fund under a trust agreement and

ERISA, which impose certain fiduciary duties on the Board—including the fiduciary

duty to collect liabilities to the Pension Fund.  Employers that agree to be contributing

employers to the Pension Fund must make fringe benefit contributions, including for

pension benefits, on behalf of their union employees.

**B.    The Winding Down of SMAC and Formation of R&M**

3.    SMAC was a sheet metal and air conditioning contractor that operated in

Hawaiʻi from 1969 until it ceased operations in late 2018.  It was founded and owned by

Melvin's father, until Melvin eventually took over the business.  Margaret is Melvin's

wife and worked as SMAC's office manager during the period relevant to the Board's

claims.  SMAC was a union shop—and longtime contributor to the Pension Fund—and

as a result of its union status, was eligible for large projects, including federal and state

projects.

4.     R&M is a limited liability company formed in March 2017 by Margaret

and Meghan, who is the daughter of Melvin and Margaret.  Unlike SMAC, it is not a

union shop, and is not eligible for (or capable of handling) large projects.  R&M was still

in operation as of the date of trial.

5.     SMAC's cessation was not a single abrupt event; rather, it reflected a

wind-down period in which SMAC's operations were diminishing while R&M began

limited activity.

6.     Between 2011 and 2016, no representatives of the Pension Fund visited the

SMAC office to discuss contribution obligations with Margaret when she was serving as

SMAC's office manager.  Nor did any representatives of the underlying union visit the

office to discuss SMAC's obligations.  As Margaret testified, neither she nor Melvin

received calls from representatives of the Pension Fund between 2011 and 2016

regarding contribution obligations.  Trial Transcript, Day 2, 87:13-88:17.  The same was

true of 2017 through 2019, when SMAC transitioned to R&M.  *Id*. at 89:14-90:19.

7.     In 2012, SMAC's then-bookkeeper, Kathy Funtila, embezzled a substantial

amount of money from SMAC.  The embezzlement continued until Margaret had

retired from her work at a bank and joined SMAC to assist Melvin.  Once at SMAC,

Margaret sensed that there was a problem with Funtila, looked into records, and then

contacted the Federal Bureau of Investigation, which eventually uncovered the

embezzlement.

8.      Before the embezzlement, SMAC had been a successful union shop.  But

after the embezzlement, and by no later than approximately 2016, Margaret recognized

that SMAC was unlikely to recover from the effects of the embezzlement.  Based on her

work in the office, she observed that the company's financial condition continued to

deteriorate, including unpaid taxes, increasing difficulty paying vendors, pressure from

banks seeking repayment on loans and lines of credit, and costs associated with the

property at 2176 Lauwiliwili Street, Kapolei, where SMAC maintained its office.  As

Margaret explained, the financial "hole" facing the company continued to grow during

this period.  Trial Tr. Day 2, 84:25-85:5.

9.      Although Margaret perceived the seriousness of SMAC's financial

condition by 2016, she did not discuss her concerns or her plans to form a separate

business with Melvin at that time.  As she testified, Melvin was not prepared to

confront the possibility of SMAC's failure and felt a strong sense of responsibility to

keep the company operating because it had been founded by his father in 1969.

Margaret understood that Melvin needed to reach that realization on his own.  Acting

independently alongside Meghan, Margaret decided to form R&M, anticipating that

Melvin would perform the hands-on work.  Trial Tr. Day 2, 85:15-87:3.

10.     As Margaret testified, she formed R&M after it became clear to her that

SMAC could not continue operating as it previously had, and by late 2016 she believed

SMAC would need to close.

11.     As both Melvin and Margaret testified, SMAC faced significant financial

pressures during the 2016-2017 period, including from creditors and federal tax liens.

Trial Tr. Day 2, 84:22-85:5.  The inability to address those liens, Melvin explained, was

the result of the fallout from the 2012 embezzlement.  Trial Tr. Day 1, 85:6-22, 91:24-92:3.

### C.     The Sale of SMAC's Shop at 2176 Lauwiliwili Street

12.     Melvin and Margaret began negotiations in March 2017 with Jean-Claude

Drui, associated with Euram, Inc. (doing business as Hawaiian Paradise Coffee) and

Letzeburg Properties, to sell units nine and ten at 2176 Lauwiliwili Street, Kapolei,

where SMAC operated its shop.  They executed a purchase and sale agreement in July

2017.  Exs. 40, 41, 46; Trial Tr. Day 1, 34:6-36:19, 140:12-141:13.  As Margaret testified,

she, Melvin, and Drui corresponded by email in March and April 2017 regarding the

sale.

13.     The Lauwiliwili Street property was owned by Margaret and Melvin

personally and leased to SMAC.  Drui initiated the discussions by reaching out to

express interest in purchasing the property.  Ex. 41; Trial Tr. Day 1, 141:10-13.

14.     As Melvin testified, he and Margaret agreed to sell the Lauwiliwili Street

property to Jean-Claude Drui for a price that exceeded the appraised value of the

7

property.  Trial Tr. Day 1, 86:24-87:3.  The property appraised for less than the agreed

sale price, leaving an approximate $100,000 difference between the appraisal and the

purchase price.

      15.     As Melvin testified, because Drui was unable to finance the full purchase

price based on the appraisal, the parties agreed that Drui would pay approximately

$9,000 per month to cover the balance above the appraised value.  As Melvin explained,

these payments were divided over time and applied to satisfy the remaining $100,000

portion of the purchase price, which was paid off over approximately one to one-and-a-

half years.

      16.     In connection with the sale, SMAC entered into a written agreement with

Letzeburg Properties LLC, an entity associated with Drui, permitting SMAC to remain

on the Lauwiliwili Street property for up to twelve months following the closing of the

sale.  Ex. 46.  As Melvin testified, the agreement provided for monthly rent of $1 during

that occupancy period.

      17.     After the sale of the property, SMAC entered into a service agreement

with Euram, Inc., also associated with Drui, under which SMAC agreed to provide

quarterly air-conditioning services for $265 per service.  Ex. 39.

      18.     The $9,000 monthly payments were associated with air-conditioning

services for the building where the Lauwiliwili Street property was located.  The

building housed multiple units, including some associated with Hawaiian Paradise

Coffee.  As Melvin testified, the $265 quarterly payments reflected a separate service

arrangement for a smaller residential system, and that those service payments were

distinct from the amounts applied toward the purchase price balance.  Trial Tr. Day 1,

89:1-7.

19.    As Margaret testified, SMAC vacated the Lauwiliwili Street property in

November 2018.  SMAC removed its equipment from the premises at that time,

disposing of some equipment through recycling and transferring other equipment to

R&M's shop at 91291 Kalaeloa Boulevard.  As she further testified, R&M did not

operate out of the Lauwiliwili Street property and used the address only as a mailing

address.  Trial Tr. Day 1, 153:12-24.

### D.    R&M's Operations

20.    In planning the formation of R&M, Margaret determined that the business

required a Responsible Managing Employee ("RME").  She learned that the RME

license attaches to the individual rather than the business entity, discovered that

Melvin's license was suspended, and contacted the Contractors License Board to

determine the steps necessary for reinstatement.  Trial Tr. Day 2, 93:3-11.  Margaret

began the process in the beginning of 2018 and received approval in October or

November 2018.  *Id.* at 94:24-95:8.

21.    During the Pension Fund's pre-lawsuit inquiry, Margaret provided

records reflecting that Margaret and Melvin's last day with SMAC was December 31,

2018, and their first day with R&M was January 1, 2019.  Exs. 29, 51; Trial Tr. Day 2,

53:18-56:2; Trial Tr. Day 3, 40:1-22.  Those records reflected how Margaret and Melvin

described the transition in formal employment terms.  The evidence at trial established,

however, that some SMAC-related work continued beyond the end of 2018 in a limited

capacity.  Trial Tr. Day 3, 9:21-10:6.

22.    The evidence also established that Meghan's involvement in R&M's

formation and operations was limited.  As Meghan testified, she did not review R&M's

articles of organization before they were filed, and she did not have conversations with

Margaret about opening R&M.  Trial Tr. Day 3, 85:4-13; Meghan Depo., 84:8-85:7.

23.    Meghan accompanied Margaret to open R&M's Central Pacific Bank

account in January 2018.  Ex. 64; Trial Tr. Day 4, 44:4-8; Meghan Depo., 49:13-50:16,

54:1-5, 111:2-4.  The bank documentation identified Margaret and Meghan as authorized

signers and reflected Meghan as "member manager."  Ex. 64.

24.    R&M's Operating Agreement identified Margaret and Meghan as

members with a 50% ownership interest and listed capital contributions in an amount

of zero.  Ex. 14, at 14.  Consistent with that document, the evidence reflected that neither

Margaret nor Meghan contributed monetary capital at formation.  *Id*.

25.    When R&M began limited activity, Melvin was still completing certain

remaining SMAC work.  As Margaret testified, the 2019 SMAC documents admitted as

Exhibit 121 reflected jobs Melvin was "finishing up" as SMAC closed, because "there

10

were still jobs on the books that he, as the owner of SMAC Hawaii, was responsible

for." Trial Tr. Day 3, 9:18-10:1. There were "two or three" such jobs at the time, but that

work was a "drop in the bucket" compared to what SMAC had handled when fully

operational. *Id.* at 10:2-14. And as Melvin testified, his contracting work was subject to

warranties, which required him to return to completed projects to perform corrective

work when necessary, even years after the installations, and including after his formal

cessation of work for SMAC. Trial Tr. Day 1, 68:10-25; 71:1-21.

26.    R&M was a small, family-run operation, and Melvin was the primary

individual performing the field work. *See, e.g.*, Trial Tr. Day 3, 14:14-25. Melvin had

served primarily as a supervisor and manager at SMAC, but later transitioned to

performing field labor when he began working at R&M.

27.    With that backdrop, R&M was not intended to be a large business, but

rather a "mom and pop" operation focused on sustaining the family; limiting the

workforce to Melvin was a way to control expenses. Trial Tr. Day 3, 14:14-25. When

additional labor was needed, R&M would subcontract work for larger projects.

28.    As Margaret also testified, R&M was not seeking large-scale work and did

not pursue union participation because it was not "looking at doing big jobs." Trial Tr.

Day 3, 15:1-2. Although SMAC, as a union business, had been eligible for substantially

larger jobs, R&M would not qualify for those jobs as a non-union shop and would not

be able to "handle" them. Trial Tr. Day 3, 15:3-17:7. Consistent with those differences,

11

during the period between 2020 and the trial in this case, R&M did not seek or qualify

for such jobs.

29.    Margaret sometimes spoke about R&M in personal terms—referring to it

as "my shop," its income at times as "my funds" or "my own money," and Melvin as

"my worker."  Trial Tr. Day 1, 123:6, 146:7, 163:20; Trial Tr. Day 2, 9:21-24, 12:2; Trial Tr.

Day 3, 66:3-4.

**E.    R&M's Finances**

30.    The evidence at trial established that, after the 2017 property sale

agreement, Melvin performed air conditioning service work for Euram during 2018 in

connection with R&M, during a period when SMAC was still winding down.  The

evidence included service agreements reflecting the Drui/Euram relationship, as well as

an R&M service agreement covering broader air conditioning services and a SMAC

agreement relating to a smaller scope of service at Drui's residence.  Exs. 28, 39; Trial Tr.

Day 1, 88:13-89:7.

31.    The evidence also established that R&M's Central Pacific Bank ("CPB")

account was opened in January 2018.  Ex. 64.  As Margaret testified, early deposits into

the CPB account included funds connected to the Drui/Euram relationship.  In

particular, she acknowledged that a $9,000 check from Euram to R&M corresponded to

the $9,000 deposit reflected on CPB records, and she testified that the funds became

available shortly after the account opening.  Exs. 65, 95.  Margaret disputed details

12

regarding the mechanics of the deposit (including handwriting on a deposit slip), but she did not dispute that the Euram check corresponded to the deposit. *Id*.

32.     As Margaret testified, she understood the $9,000 payments associated with the Drui/Euram arrangement to be amounts owed to her and Melvin in connection with the prior property-sale transaction, including what she described as a shortfall the parties sought to address through that arrangement. Trial Tr. Day 2, 15:9-19, 18:1-4. Based on her understanding, she did not view the use of those funds for personal expenses as improper, even though corporate formalities were not respected and the funds were deposited into and disbursed from R&M's account. *Id.* at 15:2-19, 17:24-18:4.

33.     CPB statements show purchases that were personal in nature, including travel and entertainment-related charges. *See, e.g.*, Exs. 97-99. But as Margaret testified, she associated those expenditures with the Drui/Euram funds that she understood to be owed to her and Melvin, rather than as revenue generated by R&M's ongoing operations. When asked about expenses related to a dinner and trip, she acknowledged them as a "treat" for "my worker." Trial Tr. Day 2, 15:2-19, 17:20-23. Here again, though, corporate formalities were not properly followed.

34.     The evidence also included check images and "cashed check" exhibits reflecting checks written from R&M's account to "cash," "petty cash," and in some instances to family members, with memo lines that were blank or contained brief descriptors such as "taxes." *See, e.g.*, Exs. 68-72, 74-76, 78-79. And QuickBooks-

13

generated reports reflect "disbursement transactions" to the Mung Lim family members. Exs. 9, 10; Trial Tr. Day 1, 120:21-123:7. But as Margaret testified, these "cash" withdrawals and similar transactions were used for business-related purposes—such as startup costs and job-related expenses—and were not personal distributions.

35.    The record also reflected that, when comparing certain check images with QuickBooks reports, some checks did not appear in the relevant QuickBooks summaries. *See, e.g.*, Exs. 9, 10, 71-72, 74-76. At other points, when shown a check and a corresponding QuickBooks line item together, Margaret acknowledged the match. Margaret also acknowledged that the Operating Agreement contemplated capital accounts for members, but she testified that R&M did not maintain those accounts in practice. She testified that she was not "tech savvy" and described the Operating Agreement as having been generated by LegalZoom. Trial Tr. Day 2, 7:18.

36.    The evidence presented at trial also reflected transactions labeled "member draw" or "owner's equity draw," along with mortgage payments made from the R&M account. *See, e.g.*, Exs. 10, 72, 74, 78-79. As Margaret testified, she sometimes took "owner's equity draw" because she was not receiving a paycheck. And as she testified, certain mortgage-related expenditures reflected efforts to stay current on essential expenses during a period of financial strain, including difficulties obtaining business credit and the use of pre-existing credit arrangements associated with SMAC.

14

37.    The record further reflected that, at certain points, the CPB account incurred insufficient funds fees.  But as Margaret testified, the overdraft episodes were not anticipated and were driven by timing and variability of payments and purchases. The record shows that R&M's accounts were not consistently underfunded, but instead became underfunded on certain specific (and time-limited) occasions.

38.    Margaret testified regarding R&M's balances over time, as reflected in Ex. 9.  The document reflected a balance of approximately $41,725 in 2019; $49,725 in 2020; and $60,825 in 2021, which, as Margaret explained, were attributable to loans during the 2020–2021 period.  As Margaret testified, these figures are consistent with R&M continuing to operate and pay its expenses.

**F.    Meghan's Role in R&M**

39.    As noted earlier, Meghan is the daughter of Melvin and Margaret.  She was identified in R&M's Operating Agreement as a member with a 50% ownership interest.  Ex. 14, at 14.  The Operating Agreement also identified R&M as manager-managed and listed both Margaret and Meghan as managers.  Ex. 14.

40.    Meghan's participation at the outset of R&M consisted of accompanying Margaret to the bank to open R&M's operating account at CPB in January 2018.  As Meghan testified, she went to the bank and signed the bank paperwork at her mother's request.  She did not have any role in establishing R&M's accounting practices, selecting vendors, negotiating contracts, or managing the company's finances at that time.

41.    As Margaret and Meghan testified, when R&M was formed, they contemplated that Meghan might eventually have a role in the business.  Meghan had grown up around the family business (SMAC Hawaii) and had, at one point, considered working with her parents.  As Meghan further testified, however, her plans changed after she began attending university and later obtained employment at a law firm, and she did not pursue a role in R&M's operations or management.  As her professional plans developed, Meghan deferred to her mother on R&M's business affairs and did not take part in running the company.

42.    Meghan did not participate in R&M's day-to-day operations.  As she testified, she did not really participate in the decision-making for R&M and it was Margaret who made business decisions.  Nor did she participate in decisions to hire R&M's employees.  This was consistent with deposition testimony from R&M's project manager, Glenda Yoza, who testified that Meghan had "no role" in R&M's operations. Yoza Depo., 75:11-24.

43.    Meghan had limited knowledge of R&M's activities and finances.  As she testified, she did not know whether R&M had taken loans from her parents, whether Margaret had made capital contributions, or whether Margaret had taken distributions from R&M.  Although Meghan was listed as a manager, she was unclear as to whether she was a "manager" or a "member-manager."

44.    As Meghan testified, her mother would occasionally inform her of broader developments "here and there," including during the COVID-19 period and in connection with potential loan activity, but Meghan did not manage the business' operations or finances.  As she also testified, she did not receive regular updates about R&M's finances and did not review bank statements or QuickBooks records.

45.    The record established that payments were made to Meghan from the R&M account, including a $530 check in February 2019 payable to "Cash – Meghan Mung Lim," and a preschool-related payment.  The record also established that Meghan later loaned funds to R&M, including an $8,000 loan in October 2020 that was repaid. Exs. 11, 27; Trial Tr. Day 3, 48:24–50:12.  As Meghan testified, she expected repayment and any documentation for intra-family loans was informal.

46.    As both Meghan and Margaret testified, Meghan was a "silent member" or "silent partner."  *See* Trial Tr. Day 3, 95:16-23.  As Meghan testified, in her understanding, a "silent member" is someone who does not engage in day-to-day operations.  *Id.*  Meghan relied on the Operating Agreement's indemnification provisions and believed those provisions would protect her from personal liability arising from R&M's operations.

//

//

G.    **The Kapolei Property Transfer**

47.    In the early 1990s, Melvin and Margaret purchased a townhome located at 92-1031 Alaa Street, Apartment 17104, in Kapolei, Hawaiʻi (the "Kapolei property"[1]). Melvin and Margaret resided in the Kapolei property for several years, welcoming their eldest daughter there, before purchasing a nearby home on Oloa Place in 1996.  Around that time, Margaret became pregnant with Meghan, and the family moved into the Oloa Place residence in order to have more space for their growing family.  Shortly thereafter, Melvin and Margaret began renting the newly vacant Kapolei property to tenants.  They maintained it as a rental property until around 2020.

48.    In 2009, Melvin and Margaret took out a mortgage loan on the Kapolei property.  The loan application indicates that the property's value at the time was $235,000.  Ex. 31.

49.    In 2015, the Board brought an action against both SMAC and Melvin individually to collect delinquent contributions owed to the Pension Fund; that action was resolved through a stipulated judgment in March of the same year.  Ex. 32.  As Margaret testified, after the stipulated judgment was entered, then-Union Trustee Reginald Castanares demanded that she sign a personal guaranty for the delinquent

---

[1]    At trial and throughout this case, the parties used different terms to refer to the property located at 92-1031 Alaa Street:  the Board referred to the property as the "Investment Property," while Defendants referred to it as the "Alaa Street Property." Rather than adopt either party's preferred terminology, the court refers to it as the "Kapolei property."

amounts owed.  When Margaret resisted signing a guaranty for a debt that she believed

was not hers, given that she was not part of the Union, Castanares slammed his hand on

the table and insisted, "if you don't have skin in the game, we can't help you!"  Trial Tr.

Day 3, 29:4-13.  Margaret testified that this was the sort of thing that "stick[s] with you."

*Id.* at 29:11.

50.     As both Margaret and Meghan testified, by the time the last rental tenant

moved out of the Kapolei property in 2020, the unit had become so run down as to be

essentially uninhabitable.  Trial Tr. Day 2, 142:13-18; Trial Tr. Day 3, 144:24-145:9.

Although it was no longer viable as a rental, the Kapolei property had sentimental

value and Margaret and Melvin wanted to keep it in the family.  Trial Tr. Day 2, 140:13-

141:8, 143:12-18.

51.     Over the course of the next few years, Margaret and Melvin began

experiencing financial hardship that impacted their ability to keep up with their

obligations on the Kapolei property.  As Margaret testified, they owed several thousand

dollars in HOA back dues.  Additionally, a substantial tax lien had been placed on the

Kapolei property at some point prior to 2023, but no one in the family was aware of the

lien until several years after the property was transferred to her and she attempted to

refinance the mortgage.  Trial Tr. Day 4, 6:11-17; 8:19-25.

52.     Margaret initially testified that by August 2021, the family had fallen

about four payments behind on the Kapolei property mortgage.  But after the Board

introduced evidence of the mortgage payments that had been timely made between January and August 2021, Margaret amended her testimony:  although the payments had kept the mortgage current through August 2021, the payments had been made by Meghan because Melvin and Margaret could not afford them.  Trial Tr. Day 3, 32:9-38:19, 56:22-57:9.  Meghan corroborated this testimony, explaining that she would provide funds to her mother to help pay the Kapolei property mortgage, as well as to cover basic household expenses.  *Id.* at 140:10-141:1, Trial Tr. Day 4, 6:18-25.  Meghan, who was living at home with her parents during this time, explained that she did not formally pay rent to her parents, but considered helping them to afford their day-to-day necessities and financial obligations to be part of her "rent."  Trial Tr. Day 4, 25:16-26:14.  Neither Margaret nor Meghan had previously testified about these details, including in their depositions.  Nonetheless, the court finds that while Margaret and Melvin did not fall behind on the Kapolei property mortgage during this time, they were able to keep up with their mortgage payments due at least in part to Meghan's financial support.

53.    As Margaret and Meghan testified, Melvin and Margaret were experiencing financial hardship during 2020 and 2021 that adversely affected their ability to retain the Kapolei property.  In addition to the HOA back dues and mortgage challenges on the Kapolei property, Margaret and Melvin were struggling to make the mortgage payments on their own Oloa Place residence and were suffering ongoing financial consequences from the SMAC embezzlement. Trial Tr. Day 2, 142:19-144:23.

20

While the Board introduced evidence showing that Margaret received occasional influxes of funds, enabling her to make various purchases and payments or to transfer funds to Meghan, the court finds that this evidence does not discredit Margaret and Meghan's testimony that on the whole, Melvin and Margaret were experiencing significant financial hardship during that same time period.

54.     By June 2020, Margaret notified the Union that SMAC had ceased operations.  In response, the Union asked SMAC to send a termination letter.  Ex. 54.  After that letter was received by the Union, Ex. 55, Pension Fund administrator Erinn Liu contacted Margaret in October 2020 to confirm SMAC's termination and to inform her about potential withdrawal liability.  Ex. 56.

55.     In February 2021, the Pension Fund's attorneys sent Margaret (as a representative of both SMAC and R&M) a letter requesting information to determine whether withdrawal liability would be assessed.  Ex. 57.  Margaret did not initially respond to the February 2021 request for information, leading Erinn Liu to follow up with Margaret via email.  In her follow-up email, Liu stated that the Pension Fund "want[s] to be sure SMAC is not obligated to pay withdrawal liability and there is a chance this liability is not applicable to your company."  Ex. 58.  Following her communications with Liu, Margaret began providing information to the Pension Fund's attorneys in March and April 2021.  *Id.*; Trial Tr. Day 2, 53:8-56:2.

56.    Around this same time, during the first quarter of 2021—January, February, and March—Margaret, Melvin, and Meghan began discussing the possibility of transferring the Kapolei property to Meghan.  Trial Tr. Day 3, 140:4-9.  By June 2021, Meghan was in contact with an attorney regarding the details of such a transfer.  Ex. 59.  And in August 2021, the transfer was finalized, with Melvin and Margaret transferring 98% of their interest in the Kapolei property to Meghan.

57.    The deed recording the transfer indicates that the transfer was made for ten dollars "and other valuable consideration."  Ex. 60.  But as Meghan testified in her deposition, she paid no money for the transfer—an assertion not inconsistent with her testimony at trial.  Meghan Depo., 9:20-22.  Instead, as Meghan explained during her trial testimony, she considered the consideration for the transfer to be her willingness to assume the mortgage on the property, which was a major liability.  Trial Tr. Day 3, 146:7-147:2.  Whether or not any monetary consideration was paid for the transfer, the court finds that Meghan believed some consideration—namely, the assumption of the mortgage—was being given for the transfer.

58.    By 2021, Meghan was living with Melvin and Margaret and raising her young daughter in her parents' Oloa Place home.  As Margaret testified, she wanted Meghan and her daughter to have their own place to live, and it had always been her intent to keep the Kapolei property within the family and never to sell it.  Trial Tr. Day 2, 140:13-25.  As Margaret explained in her testimony, those factors and the financial

22

difficulties she and Melvin were experiencing at the time were the factors motivating the property transfer.  Trial Tr. Day 2, 143:9-144:11.

59.    Meghan likewise testified that her intent in the property transfer was to acquire a place to live with her daughter.  Trial Tr. Day 3, 144:15-19.  But the "uninhabitable" condition of the property has impeded that goal:  at the time of the transfer, the unit was "disgusting," pest-ridden, and in need of extensive repairs.  *Id.* at 144:24-145:8.  To date, Meghan has invested a substantial amount of money in the property—by her own estimation, she has spent at least $50,000 on renovations with a projected total spend of $150,000, in addition to an unspecified amount of mortgage payments and HOA dues—but she has never lived there.  Trial Tr. Day 4, 11:20-24, 12:18-24.

60.    The Pension Fund ultimately made a formal demand for withdrawal liability in the amount of $610,225 on January 3, 2022, roughly five months after the property transfer occurred.  Ex. 61.

61.    The Board filed this lawsuit on February 8, 2023.  As Meghan testified, the first time she learned about withdrawal liability was when she was given service of the lawsuit.  Trial Tr. Day 4, 20:14-21:19.

62.    Although Meghan testified that she has provided the funds for her parents to pay the mortgage on the Kapolei property since at least 2021, she was not added to the mortgage until August 2023.  But as Margaret and Meghan both testified,

23

Meghan's late addition to the mortgage was the result of the family's attempt, at their

bank's suggestion, to secure a loan modification. When the bank performed a title

search on the Kapolei property as part of the loan modification process, it informed the

family that Meghan needed to be on not only the property deed but also the mortgage

itself. At that point, Meghan was added to the mortgage. Trial Tr. Day 2, 138:1-140:12.

## CONCLUSIONS OF LAW

### A.    Piercing the Corporate Veil

1.    At trial, the Plaintiff has the burden to prove by a preponderance of the

evidence that R&M's veil should be pierced as to Meghan. To determine whether

R&M's corporate veil should be pierced, the court considers three factors: "(1) the

amount of respect given to the separate identity of the corporation by its shareholders,

(2) the degree of injustice visited on the litigants by recognition of the corporate entity,

and (3) the fraudulent intent of the incorporators." *UA Loc. 343 United Ass'n of*

*Journeymen & Apprentices of Plumbing & Pipefitting Indus. of U.S. & Can. v. Nor-Cal*

*Plumbing, Inc.*, 48 F.3d 1465, 1475 (9th Cir. 1994) (cleaned up). To make this showing, a

plaintiff "must prevail on the first threshold factor and on one of the other two." *Id.*; *see*

*also Bd. of Trs. of Mill Cabinet Pension Tr. Fund for N. Cal. v. Valley Cabinet & Mfg. Co.*, 877

F.2d 769, 773 (9th Cir. 1989).

2.    "The Ninth Circuit has applied a relatively rigorous veil-piercing

standard, and ought to be placed among the circuits where it is relatively difficult to

pierce the veil." *Viera v. Chehaiber*, No. CV:08-00182, 2010 WL 960347, at *3 (C.D. Cal.

Mar. 16, 2010) (cleaned up).

3.      Although federal common law governs, courts "may look to state law for

guidance." *Valley Cabinet*, 877 F.2d at 772 (cleaned up).  Hawaiʻi courts have historically

applied a cautious veil-piercing standard and pierce the corporate veil "only where

recognition of the corporate fiction would bring about injustice and inequity or when

there is evidence that the corporate fiction has been used to perpetrate a fraud or defeat

a rightful claim." *Chung v. Animal Clinic, Inc.*, 63 Haw. 642, 645, 636 P.2d 721, 723 (1981).

4.      The first veil-piercing factor analyzes the amount of respect given to the

separate identity of the corporation.  It asks whether "there is such a unity of interest

and ownership between the corporation and the shareholder that the two no longer

exist as separate entities," and is therefore often described as a "unity of interest"

inquiry.  *Seymour v. Hull & Moreland Eng'g*, 605 F.2d 1105, 1111 (9th Cir. 1979).  Relevant

considerations include commingling of funds, failure to maintain corporate records or

capital accounts, disregard of corporate formalities, and treatment of corporate assets as

personal assets.  *Valley Cabinet*, 877 F.2d at 773.

5.      The evidence on this prong does not favor R&M.  The court finds that the

Board has met their burden to establish this factor for the following reasons.

6.      The evidence established that R&M was formed in March 2017 during a

gradual wind-down of SMAC.  SMAC's operations diminished over time while R&M

began operating.  Margaret testified that by late 2016 she believed SMAC would need to

close and that it was facing significant financial pressures, including creditor demands

and federal tax liens.  Melvin attributed SMAC's inability to resolve those liens to

financial fallout from the prior embezzlement.

       7.      The sale of the Lauwiliwili Street property—where SMAC had operated

its shop—further marked the transition.  Melvin and Margaret began negotiations to

sell the property in March 2017 and executed a sale agreement in July 2017.  Although

pre-lawsuit records reflected that Melvin's last day with SMAC was December 31, 2018,

and that his first day with R&M was January 1, 2019, trial testimony established that

some SMAC-related work continued beyond that date in a limited capacity as Melvin

finished a small number of remaining jobs.  Margaret also testified that she used some

equipment and supplies in R&M's office that has previously belonged to SMAC

Hawaiʻi.

       8.      R&M's financial practices evidence a commingling of assets between

Margaret and Melvin's personal assets and those of R&M.  Early deposits into R&M's

CPB account included funds associated with the Drui/Euram account, including a

$9,000 check from Euram that Margaret acknowledged corresponded to the deposit

reflected in CPB records.  To be sure, Margaret testified that she understood those funds

to be owed to her and Melvin personally in connection with the prior property sale

arrangements and therefore believed they could be used for personal expenses even

26

though they were deposited into, and disbursed from, the R&M account. But while the court accepts this aspect of Margaret's testimony as true, it nonetheless demonstrates the failure to abide by required corporate formalities.

9.    CPB statements reflected expenditures that appeared personal in nature, including travel and entertainment-related charges, as well as checks written to "cash," "petty cash," and family members. QuickBooks reports also revealed "member draws" or "owner's equity draws." Margaret acknowledged that R&M did not maintain member capital accounts in practice, despite the Operating Agreement's contemplation of such accounts. This, too, reveals a failure to abide by required corporate formalities.

10.    Taken together, the evidence supports a finding that R&M did not consistently observe corporate formalities and that its finances were oftentimes intertwined with family arrangements.

11.    Accordingly, the court concludes that Plaintiff has satisfied the threshold unity-of-interest factor. In reaching this conclusion, however, the court recognizes that the evidence supporting a unity of interest is materially stronger as to Margaret than as to Meghan. The record reflects that Margaret frequently described R&M in personal terms—referring to it as "my shop," its income as "my income," and Melvin as "my worker"—and the financial and operational evidence demonstrated that Margaret's relationship with the business was closely intertwined with her personal and family obligations.

27

12.     The same cannot be said as to Meghan.  Unlike Margaret, Meghan did not

hold herself out to be operating the business, did not manage R&M's day-to-day affairs,

did not control its finances, and did not treat the company as an extension of her

personal activities.  Her involvement in R&M was limited and passive, and the record

does not reflect the kind of pervasive intertwinement between individual and entity

that typically supports a finding of unity of interest as to a shareholder.

13.     In any event, a finding in the Board's favor on the first prong alone does

not resolve the veil-piercing inquiry.  Ninth Circuit precedent makes clear that

commingling and disregard of corporate formalities, without more, do not justify

imposing personal liability on a shareholder.  *Valley Cabinet*, 877 F.2d at 773; *Audit*

*Servs., Inc. v. Rolfson*, 641 F.2d 757, 764 (9th Cir. 1981).

14.     The second part of the veil-piercing test asks whether the corporation was

permeated by fraudulent intent.  The fraudulent intent prong may be satisfied "either

by proof of fraud in the formation of the corporation *or* fraudulent misuse of the

corporate form after incorporation."  *Valley Cabinet*, 877 F.2d at 773.  The inquiry focuses

on shareholder abuse of the corporate form; financial distress or "[g]arden variety

fraud," standing alone, is insufficient.  *Id*.

15.     In *Seymour v. Hull & Moreland Eng'g*, the Ninth Circuit rejected a veil-

piercing argument despite evidence from which bad faith in meeting fringe benefit

obligations might have been inferred.  The Ninth Circuit emphasized that there was no

28

evidence of fraudulent intent at formation, that the corporation operated as an ongoing enterprise for several years, and that fraud could not be inferred merely from bleak financial circumstances or business decline. *Seymour*, 605 F.2d at 1113. The same principles guide the court's analysis here.

16.     The Board does not offer any direct evidence of fraudulent intent. But it argues that fraudulent intent should be inferred from the circumstances. Its primary theory is that R&M was created as a "shell" entity to evade SMAC's obligations to the Pension Fund. *See* Dkt. No. 179, at PageID.4964. The evidence at trial does not support this characterization.

17.     The evidence showed that R&M was formed during a period in which SMAC was winding down, and not as an overnight replacement or sham entity. Although SMAC and R&M overlapped for a time, the record reflects that SMAC's operations were diminishing as R&M began limited activity, and that SMAC eventually ceased operations altogether. This evidence is consistent with the court's conclusion, at summary judgment, that R&M was essentially a successor to SMAC (though conducting a much more limited amount and type of work). But it does not support the Board's contention that R&M was "shell" used to evade SMAC's obligations. It is undisputed that at the time Melvin began performing work for R&M, he could no longer perform work on behalf of SMAC. Any work he performed for R&M, then, was not work that was siphoned away from SMAC; it was, instead, work that Melvin

simply could not have performed at all if he had been limited to SMAC. Of course, some *other* union shop could have picked up the work in SMAC's place, which is why R&M acted essentially as a successor to SMAC. But there is no evidentiary support for the proposition that R&M *took* any jobs away from SMAC. Nor is there any evidence that any significant amount of property or funds belonging to SMAC were rerouted through R&M.

18.    What is more, R&M has continued operating in the years since its formation in 2018, including through periods of financial strain and the COVID-19 pandemic. This is strong evidence that R&M is no "shell." As *Seymour* instructs, "[t]he very fact of continuing to do business for a period of . . . years tends to indicate a good faith use of the corporation to conduct a legitimate business enterprise." 605 F.2d at 1113.

19.    Furthermore, the evidence demonstrated that R&M obtained insurance coverage, that Melvin obtained his required RME and contractor's license, and that R&M entered into service agreements and pursued jobs consistent with a small, non-union operation. These facts are inconsistent with the characterization of R&M as a "shell" entity created solely to evade obligations. While R&M's initial capitalization and informal practices may have been flawed, the record supports that it was an operational business.

30

20.    To be sure, evidence of insurance coverage is not enough, standing alone,

to save R&M from veil piercing.  *Barnes v. Sea Hawai'i Rafting, LLC*, Civ. No. 13-00002,

2020 WL 6585889, at *8 (D. Haw. Nov. 9, 2020).  But in the circumstances of this case, the

insurance evidence is probative of intent.  Maintaining insurance, obtaining licensure,

and securing loans are indicia that the owners sought to operate R&M as a legitimate

business capable of performing work and assuming ordinary business risks, not as a

"shell."  In short, the court rejects the Board's characterization of R&M as a mere

"shell."

21.    Shifting gears, the Board points to R&M's dealings with Euram and the

fact that Melvin performed work for R&M during the wind-down period as evidence of

fraudulent intent.  But the existence of overlapping clients during a transition period

does not, standing alone, establish an intent to defraud.  The evidence reflected that

Melvin completed certain remaining SMAC jobs as SMAC closed, but that R&M also

entered into its own service agreements.  The court declines to infer fraud from a period

of overlap that is consistent with a finding that R&M operated as a successor business to

SMAC.  That is especially so because, as noted, there is no evidence that Melvin took on

work for R&M that he could lawfully have performed for SMAC.

22.    The Board also emphasizes the evidence of undercapitalization and

informal or inaccurate recordkeeping.  But inadequate capitalization, without evidence

that the corporation was *formed or operated to defraud creditors*, is insufficient to establish

31

fraudulent intent.  *Seymour*, 605 F.2d at 1113; *Laborers Clean-Up Cont. Admin. Tr. Fund v. Uriarte Clean-Up Serv., Inc.*, 736 F.2d 516, 524 (9th Cir. 1984).

23.     The facts here are unlike those in *Uriarte*.  There, the Ninth Circuit emphasized that the corporation failed to infuse any working capital in the form of cash or other liquid assets at inception, rendering it unable to operate or meet its obligations. *Uriarte*, 736 F.2d at 524-25.  The record here does not support a comparable finding.

24.     Here, the record supports that R&M operated with limited resources, relied at times on loans, and experienced financial difficulty.  The court cannot infer fraud "simply on the basis of bad financial times."  *Seymour*, 605 F.2d at 1113.  Contrary to the Board's assertion, the use of cash flow or loans to cover operating expenses, even during periods of negative income, does not support an inference of fraudulent intent, as such circumstances are commonplace in small businesses and reflect financial strain rather than misuse of the corporate form.  Indeed, there was ample evidence from which the court can reasonably infer that R&M endured periods of slow business and financial strain—"perhaps the most common risk in the business world."  *Id.*

25.     Plaintiff further argues that R&M was created to avoid obligations to the Pension Fund, and that Margaret continued submitting zero-hour reports after SMAC ceased operations to avoid withdrawal liability.  Even assuming arguendo that such conduct reflected bad faith or noncompliance by Margaret, the fraudulent-intent inquiry requires evidence that the shareholder against whom veil piercing is sought

used the corporate form to perpetrate a fraud. *Valley Cabinet*, 877 F.2d at 773-74. The

record does not support a finding that Meghan created R&M, directed its formation, or

participated in any scheme to evade Pension Fund obligations. She did not submit

reports to the Pension Fund or indeed have any communications with the Pension Fund

at all.

26. The Pension Fund's reliance on Meghan's limited involvement, and its

characterization of her role as "manager in name only," does not establish fraudulent

intent. The absence of joint decision-making or formal adherence to the Operating

Agreement's managerial provisions may reflect informality or poor corporate

governance, but it does not, without more, demonstrate a scheme to defraud creditors.

Ninth Circuit cases finding fraud under this prong tend to involve shareholders who

were the "driving force" behind corporate formation, created entities with the purpose

of avoiding obligations, or actively participated in their misuse. *See, e.g., NLRB v.

O'Neill*, 965 F.2d 1522, 1531 (9th Cir. 1992) ("courts . . . have looked beyond

organizational form where an individual . . . was in active concert or participation in a

scheme or plan of evasion."). The evidence here supports the opposite conclusion as to

Meghan: she was not a driving force or controlling shareholder of R&M, as she did not

manage R&M's operations or play a role in its finances. The record does not support an

inference that Meghan's designation as a manager—whether nominal or not—was

intended to create an "illusion of distance" or to perpetrate fraud, Dkt. No. 179, at

PageID.4986, and the fact that Margaret exercised primary control over the business

cannot be transformed into evidence of fraudulent intent on Meghan's part.

27.     Nor does the evidence concerning inaccurate or incomplete internal

recordkeeping establish fraudulent intent as to Meghan.  The testimony regarding

bookkeeping inaccuracies focused on Margaret's preparation of records and her

explanations for errors in QuickBooks and tax filings.  Plaintiff did not establish that

Meghan prepared those records, directed how they were maintained, or participated in

any effort to falsify them.  Absent evidence tying Meghan to intentional misuse of the

corporate form, such as the check paid for her daughter's pre-school or the $8,000

personal loan Meghan gave R&M, those deficiencies do not support veil piercing as to

her.

28.     Finally, as the analysis in *Valley Cabinet* underscores, the timing of events

does not support an inference of fraudulent intent at formation.  There, the Ninth

Circuit affirmed a finding of no fraudulent intent where the evidence supported a good-

faith belief that no withdrawal liability was owed at the time the shareholder in

question transferred corporate assets, even though the same evidence could have

supported a contrary inference.  *Valley Cabinet*, 877 F.2d at 773-74.  Similarly, the record

here does not support a finding that R&M—or Meghan—misused the corporate form

with fraudulent intent.  The evidence at trial showed that Margaret formed R&M after it

became apparent that SMAC could no longer continue operating and would need to

close.  But the record does not support a finding that R&M was formed in anticipation

of, or to evade, withdrawal liability to the Pension Fund.  At the time R&M was formed,

withdrawal liability had not been discussed or assessed (and indeed was not assessed

until 2022), so the circumstances do not support an inference that such liability was

imminent or being deliberately avoided.

29.    In the end, the Board's strongest argument is that the court should infer

fraudulent intent based on the sheer volume of evidence presented as to the first prong

(the amount of respect given to the separate identity of the corporation).  The court is

legally permitted to draw the inference on that basis, but having carefully considered

the evidence presented at trial, it declines the invitation.  In the court's view, the

evidence did not demonstrate a "common scheme to perpetrate fraud on third parties."

*Chan v. Soc'y Expeditions, Inc.*, 123 F.3d 1287, 1294 (9th Cir. 1997).  The Board has not

satisfied the fraudulent intent prong.

30.    The final part of the veil-piercing inquiry asks whether respecting the

corporate entity would produce injustice or an inequitable result.  "Shareholders and

officers of a corporation may be liable for the company's contribution obligations in

situations in which justice requires piercing the corporate veil."  *Trs. of Screen Actors

Guild-Producers Pension & Health Plans v. NYCA, Inc.*, 572 F.3d 771, 776 (9th Cir. 2009); *see

also Bd. of Trs. of W. Conf. of Teamsters Pension Tr. Fund v. H.F. Johnson, Inc.*, 830 F.2d 1009,

1015 n.4 (9th Cir. 1987).  But Ninth Circuit precedent is clear that an inability to collect

on a judgment, standing alone, "does not, by itself, constitute an inequitable result."
*Seymour*, 605 F.2d at 1113; *see also Valley Cabinet*, 877 F.2d at 774.  Hawaiʻi courts likewise
require more than insolvency or nonpayment to justify veil piercing.  *Chung*, 63 Haw. at
645, 636 P.2d at 723.

31.    As an initial matter, the court has already held Margaret and Melvin
jointly and severally liable for the withdrawal liability at issue.  Veil piercing at this
stage would not serve to prevent injustice or avoid an inequitable result; rather, it
would merely afford the Board an additional avenue of recovery against a third
individual.  The relevant inquiry is not whether the Board faces difficulty collecting its
judgment, but whether respecting R&M's separate corporate existence as to Meghan
would itself work an inequity.

32.    Here, the record does not support a finding that respecting R&M's
corporate form as to Meghan would produce injustice.  Meghan had no control over
R&M's finances or its day-to-day operations, nor did she hold herself out as operating
the business or use the corporate form to shield wrongful conduct.  The evidence
instead showed that Meghan's involvement was limited as a "silent partner," and that
she deferred to her mother on business matters.

33.    It is true that courts have found the injustice prong satisfied where "a
corporation is so undercapitalized that it is unable to meet debts that may reasonably be
expected to arise in the normal course of business."  *Uriarte*, 736 F.2d at 525 (cleaned

up).  But *Uriarte* and the cases that follow it illustrate a narrow category of circumstances:  situations in which a corporation was effectively a shell from inception, or where owners actively stripped assets or diverted funds to avoid known obligations, leaving creditors with no meaningful recourse.  *See, e.g., Bd. of Trs. of Emps.-Shopmen's Loc. 516 Pension Tr. through Galton v. Columbia Wire & Iron Works, Inc.*, 233 F. Supp. 3d 873, 886 (D. Or. 2017).

34.    Those circumstances are not present here.  This is not a case in which R&M was held out as an empty shell incapable of operating in the ordinary course, nor one in which assets were siphoned off to render the corporation judgment-proof.  R&M has operated as a functioning business and pursued work consistent with its size and scope.  Whatever R&M's financial limitations, the record does not establish that the company was deliberately structured to ensure that reasonably foreseeable obligations could never be met.

35.    Ultimately, "[c]orporate separateness is respected unless doing so would work injustice upon an innocent third party."  *Kilkenny v. Arco Marine Inc.*, 800 F.2d 853, 859 (9th Cir. 1986).  Respecting the corporate form here does not leave the Board without recourse.  The court has already held Margaret and Melvin jointly and severally liable.  The injustice prong is not satisfied merely because veil piercing would deliver an additional person from whom to collect.

37

36.     Because the Board must satisfy the unity-of-interest factor and at least one additional prong, and because it has not done so, veil piercing is not appropriate.  *Nor-Cal Plumbing*, 48 F.3d at 1475.  Although the court finds that R&M did not consistently observe corporate formalities, Plaintiff has failed to prove by a preponderance of the evidence that either fraudulent intent or an inequitable result would warrant piercing the corporate veil.  The court therefore declines to pierce R&M's corporate veil.

**B.     The Kapolei Property Transfer and Section 1392(c)**

37.     The Board separately asserts that the Kapolei property transfer was "a transaction with a principal purpose to evade or avoid withdrawal liability" and should therefore be disregarded for withdrawal liability purposes pursuant to 29 U.S.C. § 1392(c).  Dkt. No. 179, at PageID.4993.  Section 1392(c) provides:  "If a principal purpose of any transaction is to evade or avoid liability under this part, this part shall be applied (and liability shall be determined and collected) without regard to such transaction."

38.     Defendants suggest that such a transfer only "*may* be disregarded," Dkt. No. 182, at PageID.5057 (emphasis added)**,** but the language of § 1392(c) is mandatory. If a transaction is determined to have evasion or avoidance as a principal purpose, withdrawal liability "shall be determined and collected" without regard to the transaction.  29 U.S.C. § 1392(c); *see also, e.g., Teamsters Pension Tr. Fund of Phila. &*

38

*Vicinity v. Laidlaw Indus., Inc.*, 745 F. Supp. 1016, 1024-25 (D. Del. 1990) (finding that

where § 1392(c) applied, the transaction "*must* be disregarded" (emphasis added)).

39.    The determination of a transaction's "purpose" must be made in light of

the testimony at trial and other evidence.  But as both the legislative history and

statutory text make clear, § 1392(c) "requires only that *a* principal purpose of the sale be

to escape withdrawal liability."  *Santa Fe Pac. Corp. v. Cent. States, Se. & Sw. Areas*

*Pension Fund*, 22 F.3d 725, 727 (7th Cir. 1994).  As Defendants acknowledge, evasion

need not be the "sole purpose" of the transaction.  Dkt. No. 181, at PageID.5052; *see*

*Santa Fe*, 22 F.3d at 727.  But they elsewhere assert that for § 1392(c) to apply, the

evidence must show that the transaction was "primarily motivated by an intent to

evade liability."  Dkt. No 182, at PageID.5057.  To the extent they suggest evasion must

be *the* most significant motivation, Defendants go astray.  So long as evasion or

avoidance is "one of the factors that weighed heavily in the seller's thinking," § 1392(c)

applies.  *Santa Fe*, 22 F.3d at 727.  At the same time, an employer should be let "off the

hook even if one of his purposes was to beat withdrawal liability, provided however

that it was a minor, subordinate purpose."  *Id.*  In other words, the question is not

whether evasion or avoidance was *the* most significant purpose, but rather whether it

was "a major purpose," even if merely one among others.  *Id.*

40.    The legislative history of the MPPAA reveals a clear intent for "courts [to]

follow the substance rather than the form of such transactions in determining, assessing,

and collecting withdrawal liability," with § 1392(c) applying whenever "evasion of

liability is a principal purpose of a transaction, whether or not the transaction has other

purposes as well."  126 Cong. Rec. H7898 (daily ed. Aug. 26, 1980) (statement of Rep.

Frank Thompson); *see CIC-TOC Pension Plan v. Weyerhaeuser Co.*, 911 F. Supp. 2d 1088,

1096-98 (D. Or. 2012).  Congress further intended that "employers not be able to evade

or avoid withdrawal liability through changes in identity, form, or control, or through

transactions which are less than bona fide and arm's length."  *Id.*  Drawing on this

legislative history, the Ninth Circuit has suggested that courts applying § 1392(c)

should consider at least two factors:  (1) whether the transaction was "bona fide" and

"arm's-length," and (2) whether respecting the transaction would frustrate the purposes

of the MPPAA.  *Cuyamaca Meats, Inc. v. San Diego & Imperial Cntys. Butchers & Food

Empls. Pension Tr. Fund*, 827 F.2d 491, 499 (9th Cir. 1987).

      41.     Beyond the general guidance provided in *Cuyamaca Meats*, "[t]he Ninth

Circuit has not articulated a test to determine whether a transaction's principal purpose

was to avoid liability under the MPPAA."  *Carpenters Pension Tr. Fund for N. Cal. v.

Lindquist Fam. LLC*, No. 13-CV-01063, 2014 WL 2601648, at *2 (N.D. Cal. June 10, 2014).

Accordingly, courts look to a range of factors to determine whether a transaction is

bona fide and arms-length.  Defendants correctly identify several relevant

considerations which other courts have assessed in the § 1392(c) context.  *See* Dkt. No.

182, at PageID.5057.  These include (1) the consideration exchanged in the transaction,

(2) the relationship between the parties involved, and (3) the timing of the transaction.

*See Carpenters*, 2014 WL 2601648, at *2; *Connors v. Vick*, Civ. A. No. 91-0289, 1992 WL

200853, at *3-4 (S.D.W. Va. Mar. 13, 1992) (consideration and timing); *Teamsters Joint*

*Council No. 83 of Va. Pension Fund v. Empire Beef Co., Inc.*, No. 08CV340, 2011 WL 201492,

at *4 (E.D. Va. Jan. 20, 2011) (same). Other relevant factors have included (4) the size of

the withdrawal liability relative to the value of the transaction in question. *Empire Beef*,

2011 WL 201492, at *3.

42.     In addition to these considerations, some courts have "interpreted the

statute to require intent or knowledge." *Carpenters*, 2014 WL 2601648, at *2 (discussing

*Resilient Floor Covering Pension Fund v. M & M Installation, Inc.*, C08-5561, 2012 WL

669765 (N.D. Cal. Feb. 29, 2012)). The Board appears to agree that intent should be

considered, but asserts that "[t]he intent of the transferors (Margaret and Melvin) is the

relevant intent, not that of Meghan," Dkt. No. 180, at PageID.5040. Courts vary on

"whether the relevant intent is that of the seller alone, or whether courts must consider

the intent of both the transferor and the transferee." *Empire Beef*, 2011 WL 201492, at *4

n.7 (acknowledging conflicting approaches of the Third and Seventh Circuits). At least

one district court within the Ninth Circuit has concluded that although "prior decisions

applying Section 1392(c) have tended to focus on the employer's intentions, there is no

reason that the other parties' intentions should not determine the principal purposes of

the transaction." *Carpenters*, 2014 WL 2601648, at *5. The court adopts that approach

41

and therefore considers the intent of both Melvin and Margaret (as transferors) and Meghan (as transferee). This factor, along with the four described *supra*, will be used to determine whether a principal purpose of the Kapolei property transfer was to evade or avoid withdrawal liability under the MPPAA. *Cf. Carpenters*, 2014 WL 2601648, at *2.

43.    The statute does not clearly establish who bears the burden of proof. The Board asserts that "once the Pension Fund determined that a transaction was to evade or avoid withdrawal liability, Defendants had the 'burden of rebutting this presumption and [failed to] prove, by a preponderance of the evidence, that [the Board's] determination was incorrect.'" Dkt. No. 180, at PageID.5027 (quoting *Sherwin-Williams Co. v. N.Y. State Teamsters Conf. Pension, Ret. Fund*, 158 F.3d 387, 396 (6th Cir. 1998) and citing 29 U.S.C. § 1401(a)(3)(A)). But both the case and statutory provision upon which the Board relies for this proposition relate exclusively to disputes between plans and employers submitted to arbitration. *See Sherwin-Williams*, 158 F.3d at 391-92 (describing submission to arbitration); 29 U.S.C. § 1401(a) (describing procedures applicable to arbitration proceedings). This case was not submitted to arbitration, so there is no cause to apply the statutory presumption of correctness in favor of the Board, or the corresponding requirement that Defendants prove by a preponderance of the evidence that the Board's § 1392(c) determination was unreasonable or clearly erroneous. *See* 29 U.S.C. § 1401(a)(3)(A).

42

44.     But Defendants' arguments concerning the burden of proof also miss the mark. Defendants adopt the Board's recitation of the burden of proof at some points, but also assert that "the plaintiff must prove" with "clear evidence" that evasion or avoidance was a principal purpose of the transaction at others. *Compare* Dkt. No. 181, at PageID.5052 *with* Dkt. No. 182, at PageID.5057. It is not clear from where Defendants derive a "clear evidence" standard, as no caselaw or statutory provision is cited in support, and the court is aware of none.

45.     Because neither party appears to have identified the correct statutory burden of proof, and since the court cannot conclude that the parties jointly consented to the application of a different standard of proof, the court must determine the applicable burden of proof. Very few cases appear to have dealt with the circumstances of a § 1392(c) issue that was never submitted to arbitration.[2] The rare cases that have done so tend to apply a different provision of § 1401, which explains in relevant part that in "certain disputes," a determination by the plan sponsor "shall not be presumed to be correct, and the plan sponsor shall have the burden to establish, by a preponderance of the evidence, the elements of the claim under section 1392(c) of this

---

[2]     At least one court has concluded that because § 1392(c) is subject to mandatory arbitration, the failure of an employer to submit such a claim to arbitration "will result in a waiver of the right to assert the defense . . . that [a transaction] did not constitute an evade or avoid transaction." *Laidlaw Indus.*, 745 F. Supp. at 1024-25. Very few other courts appear to have adopted such a draconian view of the statute, and the Board has not requested that this court do so here. The court therefore assumes that Defendants may assert defenses to the application of § 1392(c) in the first instance.

title that a principal purpose of the transaction was to evade or avoid withdrawal liability under this subtitle." 29 U.S.C. § 1401(e)(2). But that determination only applies in narrowly prescribed situations not present here. It applies when arbitration proceedings have been commenced, *see id.* at § 1401(e)(1) ("the special rules under paragraph (2) shall be used in applying subsections (a) and (d) of this section," both of which pertain to arbitration), and only when the § 1392(c) determination is "based in whole or in part" on a transaction that occurred "before January 1, 1999," *id.* at § 1401(e)(1)(B), and at least five years before the date of withdrawal from the plan, *id.* at § 1401(e)(1)(C). *See also Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 611 (1993) (noting that these presumptions "attend the arbitration"). The cases which have applied § 1401(e) to non-arbitration cases and transactions post-dating January 1, 1999, do not appear to have grappled with these statutory limitations. *See, e.g., Lopresti v. Pace Press, Inc.*, 868 F. Supp. 2d 188, 202 (S.D.N.Y. 2012).

46.     In determining what burden of proof applies, the court begins with the statutory text. Section 1392(c) does not itself contain any statutory presumption or designated burden of proof, and for the reasons discussed above, none of the provisions in § 1401 apply where, as here, the § 1392(c) issue was not first submitted to arbitration.[3]

---

[3]     29 U.S.C. § 1401(f) contains an additional special rule for § 1392(c) cases. It provides that for transactions occurring after December 31, 1998, and more than five years before the withdrawal, the employer may elect to use the "special rules" set out in

And when a statute contains no explicit provision setting out the appropriate burden of proof, there is a strong presumption that the plaintiff should bear the burden. *See Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49 (2005); *Tourgeman v. Nelson & Kennard*, 900 F.3d 1105 (9th Cir. 2018). This presumption applies unless Congress clearly manifests a contrary intent. *Id.* Congress has not done so here. To the contrary, the existence of § 1401 shows that Congress recognized the default standard of proof and intended—in certain specific circumstances—to reallocate that burden to the defendant. In other words, it establishes that Congress knew how to shift the burden of proof to the defendant, but chose not to do so outside of the arbitration context. *Cf. Tourgeman*, 900 F.3d at 1112. And § 1401 further demonstrates how narrowly Congress meant to limit the statutory burden-shifting: its provisions are not only limited to arbitration proceedings, but also categorically exclude certain transactions and conditionally exclude others. *See* 29 U.S.C. §§ 1401(e)-(f).

47. The bottom line is that nothing in the MPPAA suggests that Congress intended to invert the traditional burden of proof for § 1392(c) disputes that were never submitted to arbitration. As a result, the court applies the default presumption and concludes that plaintiffs bear the burden of proof on their § 1392(c) claims.

---

§ 1401(e)(2). But here, the challenged transaction occurred within five years of the withdrawal, and Defendants never made any election to use the special rules in § 1401(e)(2). Additionally, § 1401(f) also modifies only paragraphs (a) and (d) of § 1401. Like § 1401(e), then, § 1401(f) cannot apply here in any event.

48.     If a transaction is ultimately found to have evasion or avoidance as a principal purpose, "liability will be determined as if the transaction to evade or avoid liability never occurred, and a plaintiff can reach those assets that were transferred in order to evade or avoid liability, as well as the parties to whom they were improperly transferred," so long as the transferees are properly included as defendants in the action. *Pension Plan of Loc. Union 786 Ret. Fund v. Lee Lumber & Bldg. Material Corp.*, No. 19-cv-06933, 2021 WL 949343, at *7 (N.D. Ill. Mar. 12, 2021) (cleaned up); *see Connors v. Marontha Coal Co., Inc.*, 670 F. Supp. 45, 47 (D.D.C. 1987).  Meghan is properly joined in this action, and no one contends otherwise.

49.     Courts applying § 1392(c) generally recognize that struggling or winding-down businesses may commonly engage in transactions that have the effect of lessening withdrawal liability for entirely legitimate reasons.  For example, a shuttering logistics company may sell off its fleet of company trucks in order to dispose of assets it no longer needs or to satisfy obligations to creditors.  Such a transaction might naturally decrease the pool of assets from which a pension fund could recover withdrawal liability, but that is not enough for the transaction to be set aside.  For § 1392(c) to apply, the transaction must have evasion or avoidance of withdrawal liability as a *principal* purpose, not a mere incidental purpose or effect.  A transaction entered into for legitimate business reasons is often less likely to come within the reach of § 1392(c), so

courts frequently assess whether consideration was given for the transaction as part of their analysis.  *See, e.g., Empire Beef*, 2011 WL 201492, at *4.

50.    In simple terms, a transaction is supported by consideration if the transferor gains some benefit or the transferee suffers some detriment.  *See Estate of Tahilan v. Friendly Care Home Health Servs., Inc.*, 731 F. Supp. 2d 1000, 1010 (D. Haw. 2010) (quoting *Young v. Allstate Ins. Co.*, 119 Haw. 403, 198 P.3d 666 (2008)).  A lack of consideration suggests a transaction that is merely a change in identity, form, or control, lacking in true economic substance.  *Cuyamaca Meats*, 827 F.2d at 499; *Carpenters*, 2014 WL 2601648, at *3.

51.    The Kapolei property transfer was not supported by consideration. Defendants offer two explanations for what consideration was given for the transfer, but neither is supported by the evidence.  Defendants first point to the deed of transfer, which shows that Melvin and Margaret transferred 98 percent of their interest in the Kapolei property to Meghan in exchange for ten dollars "and other valuable consideration."  Ex. 60.  A little more than a decade prior, the property had been appraised at a value of $235,000.  Ex. 31.  Defendants do not suggest that the property had so drastically declined in value as to be essentially worthless by the time of the 2021 transfer.  (And for good reason:  uninhabitable as the property may have been, it would not be credible to suggest that its market value was anywhere near ten dollars at the time of the transfer.)

47

52.     Instead, Defendants point to the presence of hundreds of thousands of dollars' worth of tax liens on the Kapolei property.  *See* Dkt. No. 181, at PageID.5049, Dkt. No. 182, at PageID.5062**.**  Those liens could have substantially reduced the actual value of the townhouse, but Defendants did not know about the tax liens until several years after the transfer.  Trial Tr. Day 4, 6:11-17; 8:19-25.  They could not have believed, therefore, that value was being exchanged when they accepted ten dollars in exchange for 98 percent of a property they would have understood to be valued at several thousand times that price.  Even if they had concluded that ten dollars was the appropriate amount, in any event, Meghan acknowledged that she never paid even that small amount of money for the property transfer.  Meghan Depo., 9:20-22.

53.     The deed of transfer also refers to "other valuable consideration" given for the property transfer.  At trial, Meghan testified that she believed this to be her assumption of the mortgage on the Kapolei property.  But Meghan was not added to the mortgage until 2023, when the family attempted to do a loan modification on the property.  Although the court accepts that the failure to add Meghan was an oversight and is not indicative of any deceptive intent, the fact that Meghan was not a party to the mortgage for several years undermines the argument that her assumption of the mortgage on the Kapolei property provided consideration for the transfer.

54.     Even if she had been immediately added to the mortgage, that would not have amounted to valuable consideration.  Meghan testified at trial that she had been

48

regularly paying the mortgage on the Kapolei property both before and after the

transfer.  Trial Tr. Day 3, 140:10-18; Trial Tr. Day 4, 6:18-25.  She explained that she

considered this to be part of her "rent" while she was living in her parents' house.  But

that would mean that she was already obligated to pay the mortgage at the time of the

transfer, and such a preexisting duty cannot serve as consideration for a transaction.

*See State v. Nakanelua*, 134 Haw. 489, 508-09, 345 P.3d 155, 173-74 (2015).  Moreover, the

fact that the financial state of affairs at the Kapolei property remained the same both

before and after the transfer—that is, with the mortgage being paid by Meghan on her

parents' behalf—suggests a change in identity, form, or control rather than a bona fide

transaction.  *See Carpenters*, 2014 WL 2601648, at *3.  The court therefore finds that

consideration was not given for the Kapolei property transfer.  This factor favors the

Board.

55.    "Whether a transaction is bona fide and arm's-length depends on the

relationships between the parties and the bargaining process . . . ."  *Carpenters*, 2014 WL

2601648, at *3.  Here, the lack of consideration for the Kapolei property transfer cannot

be easily separated from the relationship between Melvin, Margaret, and Meghan.  A

parent-to-child transaction in which no negotiation occurred and no value was

exchanged simply cannot be considered a bona fide or "arms-length" transaction.  *See*

*id.* (transaction was not bona fide and arms-length where "there was a close familial

relationship among the parties to the transaction, and there was no bargaining at all").

49

Defendants argue that "[w]hile the consideration was nominal . . . , this is common in family transfers and does not, by itself, establish fraudulent intent." Dkt. No. 182, at PageID.5063. That is true, but it also does not support—and in fact undermines—a conclusion that the transfer was a bona fide, arms-length transaction.

56.    Defendants observe that the transfer "was executed with proper legal formalities, including signatures, notarization, and recording with the appropriate authorities," in an apparent effort to establish that it was bona fide. Dkt. No. 182, at PageID.5063. Those facts do not appear to be in dispute. But as other courts applying § 1392(c) have observed, "Congress explicitly called on courts to follow the substance rather than the form of transactions in determining, assessing, and collecting withdrawal liability." *Weyerhaeuser Co.*, 911 F. Supp. 2d at 1098 (cleaned up). The Kapolei property transfer may have been executed in a formally appropriate manner, but that does not suggest that its substance was appropriate. *Cf. Carpenters*, 2014 WL 2601648, at *3 ("Defendants also argue repeatedly that the transaction itself was legal. . . . [T]hey may be correct, but the legality of the transaction does not help their case.").

57.    To be clear, there is nothing inherently wrong with an intrafamily asset transfer. Indeed, given Melvin and Margaret's longstanding and commendable desire to give the Kapolei property to Meghan as a place for their daughter to raise her own family, the fact that the transfer was made in exchange for little to no value is entirely understandable. But that transaction is best characterized as a gift. In other words, it

50

simply cannot be credibly suggested that Melvin and Margaret would have parted with their 98 percent interest in the Kapolei property if a stranger had come along and offered identical terms in exchange for it. Again, that does not make the property transfer *wrong*. But § 1392(c) is not limited to deceptive or nefarious transactions; it distinguishes only between "bona fide business dealings" and transactions "lacking economic substance." *Weyerhaeuser Co.*, 911 F. Supp. 2d at 1096. The property transfer here was not a bona fide, arms-length transaction with genuine economic substance, so it falls into the latter category. This factor therefore favors the Board.

58.    In light of these considerations, the court cannot say that the Kapolei property transfer was bona fide and arms-length. It must therefore turn to the second part of the *Cuyamaca* analysis: whether respecting the transaction would frustrate the purposes of the MPPAA. 827 F.2d at 499.

59.    There are at least three factors for the court to consider here. First, does the timing of the Kapolei property transfer suggest that a principal purpose of the transaction was to evade or avoid withdrawal liability? Even a transaction that is less than bona fide and arms-length should not be set aside if evasion or avoidance was not a principal purpose; its timing can shed critical light on its purpose. Second, how does the size of the transaction compare to the prospective liability? Where withdrawal liability "pales in comparison" to the transaction at issue, courts are less likely to find that evasion or avoidance of that liability was a principal purpose of the transaction.

51

*Empire Beef*, 2011 WL 201492, at *3. And finally, is there evidence that the parties

actually intended to evade or avoid such liability? If so, respecting the transaction

would plainly frustrate the purposes of the MPPAA.

60. The timing of the Kapolei property transfer suggests a principal purpose

to evade or avoid withdrawal liability. A transaction that takes place well before (or

long after) withdrawal liability is contemplated or assessed is much less likely to have a

principal purpose to evade or avoid. *See, e.g., Empire Beef*, 2011 WL 201492, at *4; *M & M*

*Installation*, 2012 WL 669765, at *1-2. By contrast, a transaction that follows on the heels

of a warning that withdrawal liability may be coming, an assessment of that liability, or

a realization that an employer's personal assets may be reached by the liability is much

more likely to be found to have a principal purpose to evade or avoid. *See Lee Lumber*,

2021 WL 949343, at *8; *Vick*, 1992 WL 200853, at *3-4; *Carpenters*, 2014 WL 2601648, at *4.

61. The evidence shows that around June 2020, Margaret informed the

Pension Fund that SMAC had ceased operations. By October 2020, in response to

SMAC's termination, Margaret had been sent information by the Pension Fund

explaining that SMAC might be subject to withdrawal liability. In February 2021, the

Pension Fund's attorneys sent Margaret a letter requesting information "to determine

whether SMAC Hawaii and/or R&M Air Condition [*sic*], LLC are subject to withdrawal

liability." Ex. 57. Margaret responded to this request by providing information to the

Pension Fund's attorneys through March and April 2021.

62.     Virtually all of the key events surrounding the Kapolei property transfer occurred during this same timeframe.  Meghan testified that the family first began discussing transferring the Kapolei property to her sometime during the first quarter of 2021, which she described as January, February, and March of that year.  This was only a few months after Margaret had first been informed about potential withdrawal liability in the fall of 2020.  And Meghan's recollections about the family beginning to discuss the property transfer in the first quarter of 2021 suggest that those conversations were likely concurrent with or immediately subsequent to Margaret's receipt of the Pension Fund's demand letter requesting information for withdrawal liability purposes. The actual process of transferring the Kapolei property—beginning with Meghan obtaining the services of an attorney in June 2021 and culminating in the August 2021 transfer—took place after Margaret had been supplying information to the Pension Fund's attorneys for several months.

63.     The timing of these events strongly supports the Board's claim.  It appears that discussions began a short time after Margaret was first notified by the Pension Fund that SMAC might be on the hook for withdrawal liability.  The mere closeness in time between these events alone might be enough to suggest that a principal purpose of the transfer was to evade or avoid withdrawal liability.  *Cf. Vick*, 1992 WL 200853, at *4 (finding that the timing of a transaction which took place four to five weeks after the defendant was served in a withdrawal liability action "render[ed] the conveyances

inherently suspect"). But that is not the only coincidence favoring the Board's claim.

Also significant is the fact that the first conversations about transferring the Kapolei

property coincided with Margaret receiving a withdrawal liability-related demand

letter from the Pension Fund's attorneys. And the legal maneuvering to effectuate the

transfer did not begin until Margaret had spent several months responding to the

Pension Fund's requests for information to determine whether withdrawal liability

would be assessed. When considered as a whole, the timing of these events creates the

unmistakable impression that an impending withdrawal liability assessment was at

least *a* major reason why Defendants wanted to transfer the Kapolei property to

Meghan. That supports the inference that evading or avoiding withdrawal liability was

more likely than not a principal purpose of the transfer itself.

64.     Defendants have not offered any compelling alternative explanation for

the timing of the transfer. They submit that the "timing of the transfer, while occurring

after the Pension Fund began investigating withdrawal liability, was primarily driven

by the family's ongoing financial struggles rather than an attempt to evade liability."

Dkt. No. 182, at PageID.5063. And the court agrees that the "evidence shows that the

Mung Lim family had been dealing with financial hardship for years before the

transfer." *Id*. But this argument ultimately begs the question it is intended to answer.

If the transfer was motivated by "ongoing financial struggles" that the family had been

dealing with "for years," *id.*, why did they choose the moment that the Pension Fund

notified Margaret about withdrawal liability to start maneuvering to transfer the

Kapolei property?

65.     The evidence at trial did not suggest any answer that would weigh against

the Board's claim.  It is beyond question that Defendants were devastated by the

embezzlement at SMAC.  But that took place in 2012, and the financial hardship that it

created had existed for years by the time of the property transfer in 2021.  There was no

evidence that other extraordinary financial circumstances were present at or near the

time of the transfer; although Margaret originally testified that the mortgage on the

Kapolei property was in arrears for several months immediately preceding the transfer,

she amended her testimony to acknowledge that she had been current on the mortgage

through 2021.  And although the court credits the testimony that the mortgage only

remained in good standing because Meghan was helping with the payments, it is

undisputed that Meghan was assisting with the mortgage well before the transfer

occurred.  That still does not explain, then, what happened in 2021 to spur Defendants

to transfer the Kapolei property to Meghan.

66.     The only other explanation offered by Defendants is that the property

transfer was intended to provide Meghan and her daughter with a place to live.  But

Margaret testified that she had always intended to keep the property in the family, so

that does not explain why the transfer ultimately occurred in 2021 specifically.  The

townhouse had been vacant for roughly a year after the final tenant moved out in 2020,

and the property was in an "uninhabitable" condition.  It therefore was not as if the

property was suddenly available or move-in ready at the time of the transfer.  Nor does

the evidence suggest that a major life event caused a change in circumstances in 2021

necessitating a separate place for Meghan to live; Meghan's daughter was five or six

years old at the time, and Meghan had been living with her at Melvin and Margaret's

house since at least 2019.

   67.  Defendants nonetheless contend that the transfer "was motivated by

legitimate financial concerns and was consistent with the family's ongoing efforts to

address their financial difficulties."  Dkt. No. 182, at PageID.5063.  The court accepts this

contention, and furthermore acknowledges that Margaret's entirely reasonable desire to

keep the property within the family and to provide a place for her daughter and

granddaughter to live provided another reason for the transfer.  But the inquiry is not

whether evasion or avoidance was the only reason for a transaction; it is whether

evasion or avoidance was "a principal purpose" for the transaction.  The timing of the

property transfer strongly suggests that evading or avoiding withdrawal liability was

indeed a principal purpose.  The existence of other legitimate purposes, whether major

or minor, does not preclude or otherwise neutralize the conclusion that evasion or

avoidance was also a principal purpose.  *Cf. Cent. States, Se. & Sw. Areas Pension Fund v.*

*Bergquist*, No. 17 C 2054, 2019 WL 1787525, at *2 (N.D. Ill. Apr. 24, 2019) (concluding

that § 1392(c) applied where a transfer was motivated by a combination of filial piety,

financial hardship, and a desire to avoid withdrawal liability).

       68.     In Defendants' view, the timing of the transaction cuts the other way.

They observe that the property transfer occurred "nearly a year before the official notice

of withdrawal liability in July 2022." Dkt. No. 182, at PageID.5062. And they conclude

that this "temporal gap" between the transfer and notice "undermines any inference of

evasive purpose, as one cannot evade a liability that has not yet been formally

asserted." *Id.* This conclusion is incorrect. As with all aspects of the analysis under

§ 1392(c), the touchstone is whether the evidence establishes that evading or avoiding

withdrawal liability was a principal purpose of the transaction. The question, then, is

whether the timing suggests that withdrawal liability was a principal consideration

behind the property transfer. It is not necessary for withdrawal liability to have been

formally imposed at the time of the transaction. And while a transaction that took place

immediately after a formal notice of withdrawal liability would undoubtedly suggest

that such liability was a major consideration behind the transfer, it is by no means the

only way in which an evasive action may be proven under § 1392(c).

       69.     Courts reject the notion that a transaction which predates a demand for

withdrawal liability cannot have evasion or avoidance as a principal purpose. For

example, in *Lee Lumber*, the court considered a transfer that had undisputedly "occurred

*before* the Pension Fund issued its notice and demand for withdrawal liability." 2021

WL 949343, at *8.  The defendant argued that the timing "undermine[d] Plaintiffs'

argument that the principal purposes of the transfer was to evade or avoid liability."  *Id.*

The court disagreed, observing that "[a]lthough Plaintiffs had not yet sent [defendant] a

notice and demand for withdrawal [] liability at the time of the transfer of the Property,

[defendant] had actively engaged in the process to determine its withdrawal liability,"

including by "exchang[ing] written statements of business affairs" with the Pension

Fund, in the several months before the transfer.  *Id.*  As a result, the court found it was

reasonable to "infer that [defendant] knew such a notice and demand was

forthcoming."  *Id.*

70.    Those circumstances are present here.  The Kapolei property transfer took

place several months before Defendants were served with a formal notice of withdrawal

liability.  But in the months leading up to the property transfer, Margaret provided

written statements of business affairs in response to the Pension Fund's requests and

corresponded at some length with Pension Fund representatives about withdrawal

liability.  This activity amounted to active engagement in the process to determine

SMAC's withdrawal liability.  As in *Lee Lumber*, these details suggest that—although no

formal demand had yet been made—Margaret knew at the time of the transfer that a

notice and demand was likely forthcoming.  Accordingly, the court concludes that the

timing of the transaction supports the inference that a principal purpose of the Kapolei

property transfer was to evade or avoid withdrawal liability.  This factor therefore favors the Board.

71.    The size of the transaction does not clearly support a finding in either direction.  Although such evidence is hardly dispositive, some courts have considered it useful to "assess[] the size of the withdrawal liability relative to the size of the allegedly fraudulent transaction."  *Carpenters*, 2014 WL 2601648, at *2.  When a transaction dwarfs the potential withdrawal liability at issue, courts are more likely to find that evading or avoiding that liability was "likely only a minor consideration."  *Id.*; *Empire Beef*, 2014 WL 2601648, at *3.

72.    It is not clear what the Kapolei property was valued at in 2021, but it seems fair to say that its worth was likely in the hundreds of thousands given its appraised value of $235,000 a dozen years prior.  SMAC's withdrawal liability was ultimately assessed at over $600,000.  Ultimately, the size of the transaction was likely roughly on par with the size of the withdrawal liability.

73.    Although the relative values of Kapolei property and withdrawal were probably similar, little can be inferred from that observation.  Defendants did not know the *actual* degree of their exposure until months after the transfer, when they received the notice and demand for withdrawal liability from the Pension Fund.  A person does not need to know the precise amount of withdrawal liability they are facing in order to take action to avoid it.  But when, as here, they did not actually know how much their

withdrawal liability would be, one cannot draw conclusions about what the *value* of the transfer says about Defendants intent to evade or avoid withdrawal liability. And while it might be fair to assume that Defendants could have predicted that withdrawal liability, if incurred, might be substantial (in light of their prior six-figure stipulated judgment with the Board), the court declines to draw that inference here. Instead, the court limits its conclusion to observing that the transaction and withdrawal liability were not so disproportionate in size as to suggest anything about whether evasion or avoidance was a principal purpose. This factor favors neither party, and the court assigns minimal weight to it.

74.     The final factor looks to the transacting parties' intent. Several courts have concluded that § 1392(c) contains "an intent or knowledge requirement," such that "in order to be found liable under this section, an employer must have been aware of its withdrawal liability and must have entered into a transaction, a principal purpose of which was to evade or avoid the liability." *M & M Installation*, 2012 WL 669765, at *2; *see also Carpenters*, 2014 WL 2601648, at *2. Put differently, § 1392 does not "apply to situations where an employer engages in a transaction, *the effect* of which is to evade or avoid withdrawal liability, unless the employer was aware of its liability and factored that into its decision." *Id.; see also Empire Beef*, 2011 WL 201492, at *3 & n.5. In some ways, this factor is an agglomeration of all the other factors, since intent can be inferred from the timing of the transaction, its size, and other like factors. But it may also be

proven by direct evidence of knowledge or intent, revealing what the parties actually had in mind when they entered into the challenged transaction.

75.    Margaret was at least aware of withdrawal liability by the time the Kapolei property transfer took place.  On the one hand, Margaret testified that she did not have actual knowledge of any withdrawal liability until she received the formal notice in January 2022.  And certain evidence could suggest that prior to that time, Margaret may not have known with certainty that SMAC was likely to be assessed withdrawal liability.[4]  But it cannot be said that Margaret was unaware of withdrawal liability at the time the family was mulling the transfer.  As the court explained in its summary judgment order, it is not necessary for a person to have actual knowledge in order for them to be treated as if they did:  if "a reasonable person in Margaret's position would have been aware of the fact of withdrawal liability," that is enough to conclude that Margaret had "constructive knowledge."  *Bd. of Trs. of the PAMCAH-UA Loc. 675 Pension Fund v. SMAC Hawaii, Inc.*, Civ. No. 23-00076, 2025 WL 2021750, at *13 (D. Haw. July 18, 2025).  Here, a reasonable person who had been emailing with the Pension Fund about withdrawal liability and responding to its withdrawal liability-

---

[4]    In fact, the Pension Fund's equivocal tone may have at times fairly suggested to Margaret that SMAC could possibly escape withdrawal liability altogether by cooperating with the Fund.  *See, e.g.*, Ex. 58 ("We want to be sure SMAC *is not* obligated to pay withdrawal liability and there is a chance this liability is not applicable to your company." (emphasis added)).

related information requests for months would have been aware, at a minimum, that

withdrawal liability *might* be looming—even if they were not *actually* certain of that fact.

76.     While mere awareness, without more, is "not equivalent to evasive

intent," *Lopresti*, 868 F. Supp. 2d at 202 (quoting *Empire Beef*, 2011 WL 201492, at *5),

there is substantial additional evidence of intent here.  As discussed earlier, the timing

of the transaction, lack of consideration, and relationship between the parties all suggest

that a principal purpose of the Kapolei property transfer was to evade or avoid

withdrawal liability.  And there is another independent reason to conclude that the

transfer was actually motivated by a desire to evade withdrawal liability.  Several years

before the property transfer, Melvin and Margaret had been (in their telling) strong-

armed by the Board into signing personal guaranties for SMAC's delinquent

contributions to the Pension Fund.  Margaret credibly testified about her vivid memory

of a Trustee slamming the table and demanding that she sign a personal guaranty so

that she would have "skin in the game."  It would have been only natural for Margaret

to worry, in light of this experience, that the Board might once again press her to put

personal assets on the line in order to satisfy the new financial obligation of withdrawal

liability.

77.     Courts in analogous circumstances have found a principal purpose to

evade or avoid in transactions undertaken in response to a concern that personal assets

might be vulnerable due to withdrawal liability.  *See Carpenters*, 2014 WL 2601648, at *4.

In *Carpenters*, the defendant had entered into a transaction to protect his personal assets after the plaintiff fund had obtained a judgment against the defendant's company for withdrawal liability.  At the time of the transaction, "more steps" would have been required to reach the defendant personally, and the court accepted that the defendant "was not certain that the Pension fund could reach his personal assets."  *Id.* Nonetheless, the court concluded that the defendant "had to be aware of the risk to his personal assets" due to the circumstances surrounding the transaction.  *Id.*

78.    The same is true here.  While Margaret likely did not know for certain whether the Board could reach her personal assets, and although she might have understood that more steps (for example, the execution of a new personal guaranty) would be required before it could do so, she must have been aware that her personal assets could ultimately be at stake if withdrawal liability was ultimately assessed against SMAC.  That provides a strong motive for the Kapolei property transfer.

79.    Whether Meghan intended to evade or avoid withdrawal liability as the transferee in the property transfer is also relevant.  It is beyond question that she did not.  Meghan offered undisputed and credible testimony at trial that she first became aware that she might be subject to withdrawal liability was when she was served with the complaint in this action in 2023.  And there is zero evidence that Meghan had any idea at the time of the transfer that SMAC, R&M, or herself or her parents might be on the hook for any sort of obligation to the Pension Fund.  Nor is there any reason why

she would have had any such notion.  As discussed above, Meghan was only minimally

involved in R&M's operations.  Her role was not the sort that would create the

expectation that she would be aware of withdrawal liability or party to discussions or

decisions that might implicate it.  Moreover, she never received any notice or

information from the Pension Fund warning her that she might be subject to

withdrawal liability.  *See* Trial Tr. Day 4, 20:14-21:19.

80.     The fact that Meghan was unaware of any potential withdrawal liability

until years after the transfer clearly establishes that she could not have intended to

evade or avoid that withdrawal liability.  Moreover, the court credits Meghan's

testimony that she intended to restore the property as place for her to live with her

daughter.  Although she has not lived in the Kapolei property to date, she credibly

testified that she had retained the services of an architect and invested over $50,000 in

renovations since obtaining the property.  Trial Tr. Day 4, 10:4-13:2.  Contrary to what

the Board suggests, the fact that renovations have not been completed and Meghan has

not lived in the property does not remotely undermine her testimony, especially given

that the Kapolei property has been the subject of yearslong litigation which threatens to

divest her of her property interest in it.  The court therefore finds that Meghan did not

intend to evade or avoid withdrawal liability when she accepted the transfer of the

Kapolei property.

81.    Even so, the court cannot accept the leap in Defendants' argument that Meghan's lack of intent renders the transfer legitimate.  They contend that "Meghan's substantial investment in renovating the property (approximately $50,000 to $60,000) demonstrates a legitimate purpose for the transfer."  Dkt. No. 181, at PageID.5052.  As discussed above, that evidence strongly suggests that Meghan's intentions were pure.  The same can be said for Meghan's testimony that "she intended to live in the property with her daughter once renovations were completed," which Defendants assert "further supports a legitimate purpose for the transfer."  *Id.*  But this evidence speaks only to Meghan's intent; it does not establish that the transfer itself was legitimate.

82.    In situations where only the transferor, but not the transferee, intended to evade or avoid withdrawal liability, § 1392(c) still applies.  *See Vick*, 1992 WL 200853, at *3 ("To allow [a transferee] to claim ignorance of the law so as to permit [a transferor] to convey his property interests would . . . thwart the policy of the MPPAA.").  And while the consequence of applying § 1392(c)—depriving a blameless party of property they obtained in good faith and invested substantial time, money, and effort into—strikes the court as draconian, the court concludes that it is the result intended by Congress.

83.    "Section 1392 is essentially punitive."  *Resilient Floor Covering Pension Tr. Fund Bd. of Trs. v. Michael's Floor Covering, Inc.*, 801 F.3d 1079, 1094 (9th Cir. 2015).  It must be applied against "'*any*' purposely evasive or devious transaction, regardless of the potential impact."  *Id.*  And as a remedial statute, it must also be "liberally construed

65

in favor of protecting the participants in employee benefit plans." *Einhorn v. M.L. Ruberton Constr. Co.*, 632 F.3d 89, 98 (3d Cir. 2011) (cleaned up).  It therefore must be applied broadly to punish and deter evasive transactions.  That is so even when, as here, the result is to deliver a potentially unfair windfall for the Board (which will now be able to collect from an improved and more valuable property, thanks to Meghan's pointless improvements to it) and to punish a well-intentioned transferee.

84.     The intent factor therefore favors the Board, albeit less strongly than it otherwise would have if Meghan had been shown to share an intent to evade or avoid withdrawal liability.

85.     On balance, these factors favor the Board.  And while the evidence that the property transfer had evasion or avoidance as a principal purpose is hardly overwhelming, it is the only conclusion that the court can draw from the facts before it. The timing of the transfer strongly supports the conclusion that it was more likely than not the result of an evasive purpose, and Defendants have offered no compelling facts from which an alternative purpose can be perceived.  Similarly, the evidence that Melvin and Margaret were concerned that their personal assets could be at risk due to withdrawal liability and wanted to shield the Kapolei property is not ironclad.  But there is sufficient evidence for the court to conclude that evasion or avoidance was a principal purpose of the transfer.  And while the court accepts that Melvin and Margaret had other legitimate purposes for the transfer—namely, attempting to lessen

the financial hardship they were enduring, and to provide a future home for their

daughter and grandchild—the court concludes, on these facts, that minimizing their

potential withdrawal liability was not a mere minor consideration.

86.    A transaction designed to shield personal assets from judgment prevents

the Board from obtaining the withdrawal liability owed and "creates precisely the

problem the MPPAA was designed to solve:  a pension fund being unable to pay

benefits because of an employer's withdrawal."  *Carpenters*, 2014 WL 2601648, at *4.

Because a principal purpose of the Kapolei property transfer was to evade or avoid

withdrawal liability, respecting that transaction would frustrate the purposes of the

MPPAA.  *Id.*

87.    In light of the foregoing, the court finds that both elements of *Cuyamaca*

*Meats* have been met.  The Kapolei property transfer was not a bona fide, arms-length

transaction, and respecting the transfer would frustrate the purposes of the MPPAA.

Put differently, the court finds that a principal purpose of the Kapolei property transfer

was to evade or avoid withdrawal liability.  The transaction therefore must be aside.

## CONCLUSION

Following the conclusion of the bench trial in this matter, and in light of the

foregoing Findings of Fact and Conclusions of Law, the court declines to pierce R&M's

corporate veil, but concludes that a principal purpose of the Kapolei Property transfer

was to evade or avoid withdrawal liability.  Accordingly, it is HEREBY ORDERED that

judgment shall be entered immediately as follows:

1. As to the Board's request to pierce R&M's corporate veil (Count V of the First

   Amended Complaint), judgment shall be entered immediately in favor of

   Defendant; and

2. As to the Board's claim that the Kapolei Property transfer was a transaction to

   evade or avoid withdrawal liability under 29 U.S.C. § 1392(c) (Count VII of

   the First Amended Complaint), judgment shall be entered immediately in

   favor of Plaintiff.

IT IS SO ORDERED.

DATED:  February 25, 2026, at Honolulu, Hawai'i.



/s/ Micah W.J. Smith

Micah W.J. Smith
United States District Judge

Civil No. 23-00076 MWJS-KJM; *Board of Trustees of the PAMCAH-UA Local 675 Pension Fund v. SMAC Hawaii, Inc., et al.*; POST-TRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW